# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

KENNETH MICHAEL TRENTADUE,
The Estate of by and through its
Personal Representative Carmen
Aguilar, et al,

      Plaintiff-Appellee/Cross-
      Appellant,

v.

STUART LEE, et al.,

      Defendant-Appellant/Cross-
      Appellee.

Nos.  01-6444, 02-6037
02-6030 and 02-6051

## ORDER
Filed February 3, 2005

Before **O'BRIEN,** Circuit Judge , **BRORBY** , Senior Circuit Judge, and
**TYMKOVICH** , Circuit Judge.

The petitions for panel rehearing filed on November 9, 2004, November 26, 2004, and December 27, 2004, are granted in part.  A revised opinion is attached.

The petitions for rehearing en banc was transmitted to all of the judges of the court who are in regular active service as required by Fed. R. App. P. 35.  As no member of the panel and no judge in regular active service on the court

requested that the court be polled, the petitions are denied. Judge McConnell did not participate.

Entered for the Court
Patrick J. Fisher, Clerk


By:
    Deputy Clerk

PUBLISH

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 3 2005**

**PATRICK FISHER**
**Clerk**

# UNITED STATES COURT OF APPEALS

# TENH CIRCUIT

KENNETH MICHAEL TRENTADUE,
The Estate of by and through its
Personal Representative Carmen
Aguilar,

      Plaintiff-Appellee/Cross-
      Appellant,

and

CARMEN AGUILAR TRENTADUE,
individually and as Personal
Representative for the Estate of
Kenneth Michael Trentadue and
Guardian Ad Litem for Vito Miguel
Trentadue; WILMA LOU
TRENTADUE; JESSE JAMES
TRENTADUE; DONNA
TRENTADUE SWEENEY; LEE
FREDERICK TRENTADUE; JESSE
CARL TRENTADUE,

        Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA;
DEPARTMENT OF JUSTICE;
FEDERAL BUREAU OF PRISONS;
FEDERAL BUREAU OF
INVESTIGATION,

      Defendants,

Nos. 01-6444 and 02-6037

STUART LEE,

    Defendant-Appellant/Cross-
    Appellee,

KENNETH FREEMAN,

    Defendant-Cross-Appellee.

_____

UNITED STATES OF AMERICA,

    Amicus Curiae.

_____

KENNETH MICHAEL TRENTADUE,
The Estate of by and through its
Personal Representative Carmen
Aguilar; CARMEN AGUILAR
TRENTADUE, individually and as
Personal Representative for the Estate
of Kenneth Michael Trentadue and
Guardian Ad Litem for Vito Miguel
Trentadue; WILMA LOU
TRENTADUE; JESSE JAMES
TRENTADUE; DONNA
TRENTADUE SWEENEY; LEE
FREDERICK TRENTADUE; JESSE
CARL TRENTADUE,

    Plaintiffs-Appellees/Cross -
    Appellants,

v.

UNITED STATES OF AMERICA,

    Defendant-Appellant/Cross-
    Appellee,

Nos. 02-6030 and 02-6051

-2-

and

DEPARTMENT OF JUSTICE;
FEDERAL BUREAU OF PRISONS;
FEDERAL BUREAU OF
INVESTIGATION; STUART LEE,

Defendants.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 97 849 F)**

---

Michael E. Robinson, Department of Justice (Robert D. McCallum, Jr., Assistant Attorney General, Robert G. McCampbell, United States Attorney, and Robert S. Greenspan, Attorney, Department of Justice, with him on the briefs), Washington, D.C., for Defendants-Appellants/Cross-Appellees United States of America, Department of Justice, Federal Bureau of Prisons, and Federal Bureau of Investigations, and for Amicus Curiae United States in support of Stuart Lee.

Robert D. Baron (Gloyd McCoy with him on the brief), Coyle, McCoy & Burton, Oklahoma City, Oklahoma, for Defendant-Appellant/Cross-Appellee Stuart Lee.

Charles P. Sampson, Suitter Axland (Joe B. Reynolds and R. Scott Adams, Adams & Associates, Oklahoma City, Oklahoma, with him on the briefs) Salt Lake City, Utah, for Plaintiffs-Appellees/Cross-Appellants.

Barry W. Nance, Kenneth R. Nance, filed a brief for Cross-Appellee Kenneth Freeman.

---

Before **O'BRIEN,** Circuit Judge, **BRORBY** , Senior Circuit Judge, and **TYMKOVICH** , Circuit Judge.

---

**TYMKOVICH** , Circuit Judge.

-3-

_____

The United States appeals from an adverse judgment awarding the Estate of Kenneth M. Trentadue and members of Trentadue's family $1.1 million in damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80 (2000), for the intentional infliction of emotional distress following Trentadue's death at a federal detention center in Oklahoma. Prison official Stuart A. Lee appeals the judgment entered on a jury verdict finding him liable for deliberate indifference to Trentadue's medical needs under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Estate and family members (Trentadues or plaintiffs) in turn raise twenty-one issues on cross-appeal. They primarily contend that the district court committed clear error in finding Trentadue committed suicide in his prison cell and in finding that federal officials did not engage in the intentional destruction of evidence.

The principal issues presented by the government's appeal are (1) whether plaintiffs have exhausted the FTCA's notice requirements; (2) whether the FTCA's misrepresentation exception bars plaintiffs' intentional infliction of emotional distress claim; (3) whether plaintiffs have satisfied the elements of intentional infliction of emotional distress under Oklahoma law; and (4) whether the FTCA's judgment bar provision precludes imposition of the *Bivens* judgment

-4-

against Lee. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.

## I. Background

### A. Introduction

Kenneth M. Trentadue was arrested in California in June 1995 for driving while intoxicated. During the booking procedure police determined that Trentadue had an outstanding warrant based on federal parole violations committed after his 1988 release from prison, where he had served six years for bank robbery. He was arrested for these parole violations and held in local jails for the next few weeks.

On August 18, 1995, the Bureau of Prisons (BOP) sent Trentadue to the Federal Transfer Center (FTC) in Oklahoma City for a parole revocation hearing. Upon arrival, Trentadue was placed in the Parole Violator's Unit of the prison where he made several calls to family members and assured them he would not be at the FTC long. Two days later, on August 20, Trentadue asked to be placed in protective custody and prison officials moved him to a cell in the prison's Special Housing Unit (SHU). At 3:02 a.m. the following morning, guards found Trentadue's blood-soaked body in his cell hanging from a noose made of torn bed sheets. He was pronounced dead a few minutes later.

-5-

The circumstances surrounding Trentadue's death raise troubling questions. Trentadue's family maintains Trentadue was murdered by prison guards or another inmate, and claims prison officials acted to cover up the suspicious nature of his death by destroying evidence and cleaning his cell before an investigation could be completed. They also allege prison officials were deliberately indifferent to Trentadue's medical needs as guards waited several minutes to open the cell door and cut Trentadue's noose. The government disputes this version of the events, claiming Trentadue's wounds were self-inflicted and asserting he was dead by the time guards discovered him.

## B. Trentadue's Death

On the morning of August 20, 1995, two days after arriving at the FTC, Trentadue filled out an administrative form requesting admission to the SHU. He stated on the form that he believed other inmates were "out to get him" and that he was requesting admission for his own protection. After a strip search and physical inspection, officers noted only that Trentadue had a blister on his heel, and placed him in a cell alone at approximately 8:00 a.m. FTC records from August 20 indicate that other inmates were housed nearby Trentadue in the SHU, but the records contain no reports of abnormal activity.

Officers conducting a routine cell check saw Trentadue asleep in his bed at 2:38 a.m. the following morning. There were no indications that anything was

amiss at that time as officers saw no signs of blood or torn bed sheets. FTC records indicate the next cell check occurred twenty-four minutes later, at 3:02 a.m., at which time Officers Ellis and Creasey discovered Trentadue hanging in his cell by a ligature made of torn bed sheets. Officer Ellis radioed the prison control center: "I have one hanging," and an emergency message was broadcast throughout the FTC.

The emergency message prompted a flurry of activity within the prison. Lieutenant Stuart A. Lee, the highest ranking officer in the FTC during the relevant period, was in the control center when guards discovered Trentadue. Lieutenant Lee immediately departed for the SHU and on the way radioed the prison physician assistant to report to Trentadue's cell. Lee also radioed Officer Ellis and instructed him not to go into the cell and not to unlock the door.

Lieutenant Lee and other officers arrived at the cell two to three minutes after receiving the initial radio call. Lee looked through the cell door window and saw Trentadue hanging from a vent in the ceiling, blood on his body and blood on the floor. Lee testified that Trentadue's eyes were closed "as if he was in a deep sleep" and that he was pale and "silently still." Based on these observations, Lee concluded that Trentadue was already dead and did not immediately open the cell door. Some of the delay was also apparently due to Lee's decision to videotape

the cell entry and the need to obtain scissors from the control center to cut the noose.

Once inside the cell, officers did not immediately cut Trentadue down nor did they attempt to lift him in order to relieve pressure on his neck. When Trentadue was finally lowered to the ground the physician assistant conducted a cursory physical examination and determined that Trentadue was dead. No one attempted CPR. FTC records show that Trentadue's body was removed from his cell to the prison infirmary at 3:10 a.m., eight minutes after officers discovered him hanging.

## C. The Initial Investigation and Autopsy

The FTC official responsible for investigating inmate deaths, Special Investigative Supervisor Lieutenant Kenneth Freeman, was notified of Trentadue's death shortly after his body was removed from the SHU. Lieutenant Freeman's official duties included securing potential crime scenes and collecting and preserving evidence. At trial he testified that he did not consider Trentadue's cell a crime scene because prison officials told him Trentadue committed suicide. As a result, Freeman's investigation of the cell was perfunctory. He arrived at the FTC at approximately 5:30 a.m. and attempted to photograph everything in the cell with blood on it. He collected some physical evidence from the cell, including several of Trentadue's bloodstained personal items, and later

photographed Trentadue's body in the infirmary. After Freeman completed his investigation, FTC officials ordered Trentadue's cell cleaned by prison staff. Both the cell and the infirmary were clean by early afternoon.

Shortly thereafter Trentadue's body was transferred to the Oklahoma Medical Examiner's Office. The Chief Medical Examiner of the State of Oklahoma, Dr. Fred Jordan, completed an autopsy report that afternoon. He documented numerous injuries to Trentadue's body, including multiple contusions on the head, arms, back, and legs; a bruised anal verge; lacerations on the head and neck; a small fracture to a neck bone; and several skin abrasions. Because of these extensive injuries, Dr. Jordan initially listed the manner of death as "pending," and later classified it as "unknown."

## D. The Treatment of the Family

The FTC's acting warden, Marie Carter, called Trentadue's mother the morning of his death, as Trentadue had listed her as his next of kin upon being committed to the FTC. Warden Carter testified that she told Wilma Trentadue her son had died of an apparent suicide and that BOP would be performing an autopsy with the family's concurrence. Wilma Trentadue told Carter that only Trentadue's wife, Carmen, could give permission for such a procedure. Carmen Trentadue testified that she spoke with Warden Carter that morning but never consented to an autopsy.

-9-

Later that day, Warden Carter spoke with Trentadue's brother, Jesse Trentadue, a lawyer, who insisted on handling all matters relating to his brother's death. During this conversation Jesse Trentadue asked BOP to conduct an autopsy, but Carter told him no autopsy could be performed without Wilma Trentadue's written authorization as next of kin. Despite this statement, the record is clear that prison officials had already authorized the medical examiner's autopsy and that it was completed by the afternoon of August 21.

The next day, August 22, Jesse Trentadue faxed a letter to Warden Carter. He reiterated that he wanted to handle his brother's affairs, told BOP an autopsy authorization was forthcoming, and requested information regarding the details of his brother's death, including any evidence suggesting the cause was other than suicide. Jesse received no response to these inquiries. The district court found that BOP never notified Trentadue's family an autopsy had in fact been performed and never told the family about the obvious and extensive trauma to Trentadue's body. Jesse testified: "I was never told that he had any injuries at all."

E. The Body Is Shipped To California

On August 26, the medical examiner shipped Trentadue's remains to a California funeral home. Trentadue's wife, mother and sister were present when the body arrived. Upon opening the casket, the family members saw the autopsy incisions and numerous bruises and lacerations on Trentadue's body. These

injuries were unexpected, so they had the body removed from the casket and photographed by funeral home employees. Trentadue's wife told Jesse Trentadue and other family members about the body's condition later that same day.

On September 1, the FTC issued a press release regarding Trentadue's death. It stated that the Oklahoma Medical Examiner had tentatively ruled the death a suicide and that Trentadue's injuries were the result of his persistent attempts to harm himself. This press release conflicted with the facts then known to BOP. As previously noted, the medical examiner had listed the cause of death as "unknown," not suicide. The press release was the first time the Trentadues heard of an official investigation into their relative's death.

## F. The Subsequent Investigations

Trentadue's death spawned a number of federal and local investigations. The BOP conducted an initial internal investigation in the months following Trentadue's death, but its investigation ended soon after the FBI's Oklahoma Field Office opened a criminal investigation into the death in late 1995. The FBI investigation continued at a slow pace for the next several months. Trentadue's family and the Oklahoma Medical Examiner, suspicious of the way the federal government was handling the case, raised numerous questions about the manner and circumstances of Trentadue's death. In response to these questions, the Criminal Section of the United States Department of Justice, Civil Rights

Division, began to supervise the investigation, and in early 1996, determined that the matter warranted presentation to a federal grand jury. The FBI conducted numerous witness interviews, which the Department of Justice (DOJ) presented along with other evidence to the grand jury. After several months of grand jury proceedings, DOJ issued a press release stating that the investigation revealed no credible evidence that FTC personnel had violated Trentadue's civil rights, and no evidence that Trentadue had been murdered.

After the grand jury proceedings, the DOJ Office of the Inspector General commenced its own inquiry into Trentadue's death. Like the Civil Rights Division, it concluded the evidence showed Trentadue had committed suicide, but found serious deficiencies in BOP's response to his death. Among other things, it noted that FTC's investigation of the incident was inadequate and that FTC personnel had misplaced or altered crucial evidence.

The Oklahoma City Police Department also conducted an investigation at the urging of the Oklahoma City District Attorney. The District Attorney concluded, based on its independent review of the matter, that Trentadue's death was a suicide and that he had not been beaten and murdered by correctional officers or inmates. Following this investigation, the medical examiner, Dr. Jordan, changed the manner of death in his autopsy report from "unknown" to "suicide," and identified the cause of death as "traumatic asphyxia."

## G. Course of Proceedings

In August 1996, Trentadue's estate filed an administrative claim with the DOJ. The claim generally was based on the belief that prison guards had murdered Trentadue, and included a claim for damages for intentional infliction of emotional distress based on prison officials' attempt to conceal the manner of his death. DOJ denied the administrative claim.

Thereafter, Trentadue's estate and members of his family filed this action against the United States, the DOJ, the BOP, and the FBI, and against twelve prison officials and employees in their individual capacities. Among other claims, the Trentadues brought a claim against the government under the FTCA for intentional infliction of emotional distress. Plaintiffs' amended complaint asserted that the government:

> engaged in extreme acts of misconduct such as, but not limited to concealing the manner and circumstances of Kenneth Michael Trentadue's death, the mutilation of Kenneth Michael Trentadue's body, falsely asserting that Kenneth Michael Trentadue had committed suicide, saying that the injuries and trauma upon Kenneth Michael Trentadue's body [were] self-inflicted or implying that those injuries had been done by his family following death, stating that Kenneth Michael Trentadue had killed himself because he had AIDS, and other illegal and wrongful acts.

Plaintiffs alleged "[t]hese and other acts" by the government "were so outrageous and extreme as to exceed all bounds of what is tolerated in a civilized

-13-

community." Their complaint also asserted civil rights violations by Lieutenants Lee and Freeman under *Bivens*.[1]

Before trial, the district court granted summary judgment to Freeman on the basis of qualified immunity. The district court tried the FTCA action and remaining *Bivens* claims against Lee together; the FTCA action was tried to the bench and the *Bivens* claims presented to a jury. After a four-week trial, the jury in the *Bivens* case returned a verdict finding Lee liable for violating Trentadue's civil rights by being deliberately indifferent to his serious medical needs, and awarded the plaintiffs $20,000 in compensatory damages. The jury rejected all of plaintiffs' remaining *Bivens* claims.

Five months later, the district court in the FTCA action entered judgment against the government for intentional infliction of emotional distress, and awarded plaintiffs $1.1 million in damages.[2] The court found against plaintiffs on all other FTCA claims. The government's motion to amend the judgment was denied.

---

[1] In addition, the amended complaint alleged that the government committed assault and battery resulting in Trentadue's injuries and death, was negligent in failing to provide for Trentadue's safety and not immediately administering to his medical needs, intentionally destroyed or altered evidence in order to conceal the manner and circumstances of his death, engaged in a conspiracy to violate his constitutional rights, and committed various statutory torts under Oklahoma law.

[2] The district court awarded Trentadue's wife $250,000, his mother and three siblings $200,000 each, and his deceased father's estate $50,000.

Both the government and Lee filed timely notices of appeal.

## II. FTCA

The FTCA constitutes a limited waiver of the federal government's sovereign immunity from private suit. *See* 28 U.S.C. § 1346(b). The prerequisite for liability under the FTCA is a "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* The government and Lee raise a total of four issues on appeal with regard to the district court's award of damages under the FTCA. The issues involve (a) the notice of claim; (b) the misrepresentation exception to the FTCA; (c) the application of the tort of intentional infliction of emotional distress; and (d) the judgment bar to the FTCA.[3]

### A. Notice of the Claim

---

[3] We note up front that circuit courts have allowed cases involving emotional distress under the FTCA. *See, e.g.* , *Jimenez-Nieves v. United States* , 682 F.2d 1 (1st Cir. 1982); *Kohn v. United States* , 680 F.2d 922 (2d Cir. 1982); *Plummer v. United States* , 580 F.2d 72 (3d Cir. 1978); *Andrews v. United States* , 732 F.2d 366 (4th Cir. 1984); *Truman v. United States* , 26 F.3d 592 (5th Cir. 1994); *McLean v. United States* , 613 F.2d 603 (5th Cir. 1980); *Ferguson v. United States Army* , 938 F.2d 55 (6th Cir. 1991); *Gross v. United States* , 676 F.2d 295 (8th Cir. 1982); *Sabow v. United States* , 93 F.3d 1445 (9th Cir. 1996). In any event, the government has not claimed in this appeal that the tort of intentional infliction of emotional distress is per se unavailable under the FTCA.

-15-

The first issue is whether plaintiffs' administrative claim satisfied the FTCA's notice requirements. "Because the FTCA constitutes a waiver of the government's sovereign immunity, the notice requirements established by the FTCA must be strictly construed. The requirements are jurisdictional and cannot be waived." *Bradley v. United States ex rel. Veterans Admin.*, 951 F.2d 268, 270 (10th Cir. 1991) (citation omitted).

The jurisdictional statute, 28 U.S.C. § 2675(a), "requires that claims for damages against the government be presented to the appropriate federal agency by filing '(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim.'" *Bradley*, 951 F.2d at 270 (quoting *Warren v. United States Dep't of Interior Bureau of Land Mgmt.*, 724 F.2d 776, 780 (9th Cir. 1984)). Whether the district court has subject matter jurisdiction over a claim is a question of law we review de novo. *Id.*

The plaintiffs' administrative claim in this case included an intentional infliction of emotional distress claim and specified the damages sought. Nonetheless, the government contends the claim was insufficient in that it was based on a theory that prison officials had murdered Trentadue and did not discuss the specific grounds relied on by the district court in awarding damages, namely, the government's treatment of the Trentadue family in the aftermath of

-16-

his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval. We disagree with the government's position.

In *Dynamic Image Technologies, Inc. v. United States*, the First Circuit described the test under § 2675(a) as "an eminently pragmatic one: as long as the language of an administrative claim serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought, it fulfills the notice-of-claim requirement." 221 F.3d 34, 40 (1st Cir. 2000). Several courts in this jurisdiction have similarly interpreted the provision to require notice of the facts and circumstances underlying a claim rather than the exact grounds upon which plaintiff seeks to hold the government liable. *See Barnson v. United States*, 531 F. Supp. 614, 623 (D. Utah 1982) ("[A] claim is sufficient which notifies the agency of the facts of the incident and need not elaborate all possible causes of action or theories of liability."); *see also Mellor v. United States*, 484 F. Supp. 641, 642 (D. Utah 1978) ("The purpose of the administrative claim procedure is to allow the agency to expedite the claims procedure and avoid unnecessary litigation by providing a relatively informal nonjudicial resolution of the claim."). We agree that the FTCA's notice requirements should not be interpreted inflexibly. *See Dynamic Image*, 221 F.3d at 40.

-17-

Applying these standards here, we conclude that plaintiffs' administrative claim provided notice that DOJ should investigate the prison officials' conduct. Plaintiffs' complaint sought damages based on the government's "extreme acts of misconduct," including the mutilation of Trentadue's body, the assertion that Trentadue's family caused his injuries, and the statement that Trentadue killed himself because he had AIDS. The complaint further stated that "[t]hese and other acts . . . were so extreme as to exceed all bounds of what is tolerated in a civilized community." This language gave DOJ notice of the facts and circumstances surrounding plaintiffs' emotional distress claim and, moreover, is consistent with plaintiffs' subsequent allegations in their amended complaint.

The government nevertheless argues that *Dynamic Image* requires a different outcome. There, plaintiff filed an administrative claim for damages with the United States Postal Service following his forcible removal from a postal service trade show. *Dynamic Image*, 221 F.3d at 36. In the claim he alleged "negligent misrepresentation, libel, slander, intentional interference with contractual relations, and discrimination under 42 U.S.C. § 1983." *Id.* He then brought claims under the FTCA for false arrest, intentional infliction of emotional distress and negligent supervision. *Id.* at 37. Because those causes of action were based on an incident not mentioned in plaintiff's administrative claim, the First Circuit held that the agency was not put on notice that it should investigate the

potentially tortious conduct, and dismissed the complaint for lack of subject matter jurisdiction. *Id.* at 40-41. In contrast, here, the plaintiffs' administrative claim specifically included a claim for intentional infliction of emotional distress and was based on the same underlying conduct that supported their amended complaint.

Because we conclude plaintiffs' administrative claim provided the government with sufficient notice of their intentional infliction of emotional distress claim, the district court did not lack jurisdiction under § 2675(a) of the FTCA.

### B. Misrepresentation Exception

The second issue on appeal involves the FTCA's intentional torts exception. *See* 28 U.S.C. § 2680(h).[4] If a claim against the government falls within an exception to the FTCA, the cause of action must be dismissed for want of federal subject matter jurisdiction. *See Dalehite v. United States*, 346 U.S. 15, 31 (1953) (holding that where discretionary function exception of § 2680(a) applied, district court lacked subject matter jurisdiction over cause of action), *partially overruled on other grounds by Rayonier, Inc. v. United States*, 352 U.S.

---

[4] Section 2680(h) provides that the FTCA does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

315 (1957); *Tippett v. United States,* 108 F.3d 1194, 1196 (10th Cir. 1997) (also holding no subject matter jurisdiction where § 2680(a) applied); *see also Hydrogen Technology Corp. v. United States*, 831 F.2d 1155, 1161 (1st Cir. 1987) ("[B]ecause 28 U.S.C. § 1346(b) provides that federal courts shall have jurisdiction over FTCA claims '*subject to*,' . . . section 2680, the exceptions found in that section define the limits of federal subject matter jurisdiction in this area."). Application of the misrepresentation exception therefore presents a threshold jurisdictional determination which we review de novo. *See Daigle v. Shell Oil Co*., 972 F.2d 1527, 1537 (10th Cir. 1992).

Section 2680(h) provides that the FTCA does not apply to claims "arising out of" misrepresentation or deceit. The government argues plaintiffs' emotional distress claim falls within the misrepresentation exception because the district court found that the Trentadues suffered damages when the government failed to communicate certain facts to the family, namely, the battered condition of Trentadue's body and that an autopsy had been performed. The government contends that plaintiffs can point to no conduct independent of this failure to communicate, thus their emotional distress claim must be deemed to arise of out misrepresentation within the meaning of § 2680(h). We disagree.

"The misrepresentation exception applies only when the action itself falls within the commonly understood definition of a misrepresentation claim." *Block*

*v. Neal*, 460 U.S. 289, 296 n.5 (1983) (citations and quotations omitted).  For

purposes of the FTCA, misrepresentation includes those claims "arising out of

negligent, as well as willful, misrepresentation."  *United States v. Neustadt*, 366

U.S. 696, 702 (1961).  Negligent misrepresentation, in the "traditional and

commonly understood legal definition of the tort," involves a violation of the

"duty to use due care in obtaining and communicating information upon which [a]

party may reasonably be expected to rely in the conduct of his economic affairs."

*Id.* at 706.  Such claims have "been confined 'very largely to the invasion of

interests of a financial or commercial character, in the course of business

dealings.'"  *Block*, 460 U.S. at 296 n.5 (quoting *Neustadt,* 366 U.S. at 711 n.26);

*see also Jimenez-Nieves v. United States*, 682 F.2d 1, 5 (1st Cir. 1982)

("misrepresentation" in the Tort Claims Act should be confined to its traditional,

or core, meaning as a separate tort).

In accordance with these rules, circuit courts have held that a claim must

contain the essential elements of misrepresentation to come within the exception.

*See Jimenez-Nieves*, 682 F.2d at 4-5; *Kohn v. United States*, 680 F.2d 922, 926

(2d Cir. 1982) (exception generally has been applied only to actions for damages

due to commercial decisions that were predicated on incorrect or incomplete

information); *Reynolds v. United States*, 643 F.2d 707, 711 (10th Cir. 1981)

(exception applies where plaintiff relies on false representations to his financial

detriment).  Those elements include "reliance by the plaintiff . . . upon the false information that has been provided," and "pecuniary loss."  *Jimenez-Nieves*, 682 F.2d at 4 (citing applicable sections of the Restatement (Second) of Torts).

Furthermore, courts have held that the misrepresentation exception does not bar suits on other grounds in cases in which misrepresentations are collaterally involved.  *See, e.g., Saraw P'ship v. United States*, 67 F.3d 567, 570-71 (5th Cir. 1995) (holding misrepresentation exception does not bar plaintiff's negligence claim where government's lack of communication was collateral to the essential act that spawned the damages).  As the First Circuit said in *Jimenez-Nieves*, "we can discern no congressional purpose that might have been served in defining [misrepresentation] more broadly, to include false statements that are happenstance causal elements of other torts."  682 F.2d at 5.

The government argues the misrepresentations at issue here are more than collaterally involved and constitute the very conduct giving rise to plaintiffs' emotional distress claim.  However, even acknowledging that the government failed to inform the Trentadues of certain facts, we agree with the district court's conclusion that the misrepresentation exception does not apply in this case. Plaintiffs' emotional distress arises from the government's callous treatment of the family in the aftermath of Trentadue's death, including its shipping of Trentadue's battered remains to unsuspecting family members.  Two essential

components of negligent misrepresentation — reliance and pecuniary loss — are not present on the record before us. *See Jimenez-Nieves*, 682 F.2d at 4. Therefore, in our view, the district court correctly found that this is not an action for negligent misrepresentation or deceit under § 2680(h).[5]

Accordingly, we conclude plaintiffs' intentional infliction of emotional distress claim is not barred by the FTCA's misrepresentation exception.

### C. Intentional Infliction of Emotional Distress

The next hurdle faced by the Trentadues is the government's assertion that the district court erred in awarding damages for intentional infliction of emotional distress. Specifically, the government argues plaintiffs' evidence failed to satisfy any of the elements of intentional infliction of emotional distress under Oklahoma law. Whether plaintiffs have proved intentional infliction of emotional distress is a matter of law we review de novo. *See Clark v. Brien*, 59 F.3d 1082, 1086 (10th Cir. 1995).

### 1. The Elements of the Tort

---

[5] *JBP Acquisitions, LP v. United States ex rel. FDIC*, 224 F.3d 1260 (11th Cir. 2000), a case relied on by the government, supports this conclusion. The Eleventh Circuit made clear that the FTCA's misrepresentation exception applies when the essential elements of reliance and pecuniary loss are present. It stated: "[w]ithout the false representation by the Government that it was the owner of the Property, the consent agreement in the condemnation proceedings never would have been consummated, the Property would not have been demolished, and [plaintiff] would have suffered no injury." *Id.* at 1265.

Oklahoma first recognized intentional infliction of emotional distress as an independent tort in *Breeden v. League Services Corp.*, 575 P.2d 1374 (Okla. 1978). *Breeden* teaches that the cause of action is governed by the narrow standards of the Restatement (Second) of Torts § 46.[6] *Id.* at 1376. To recover damages for intentional infliction of emotional distress a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe. *See Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir. 1991) (applying Oklahoma law); *Computer Publ'n, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002).

The commentary to Restatement § 46 explains that "recklessness" in the first element includes actions that are in "deliberate disregard of a high degree of probability that the emotional distress will follow." Restatement (Second) of Torts § 46 cmt. i.

The second element of the tort requires proof that the tortfeasor's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

---

[6] Section 46 of the Restatement (Second) of Torts provides, in pertinent part: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

-24-

intolerable in a civilized community." *Kraszewski v. Baptist Med. Ctr. of Okla., Inc.*, 916 P.2d 241, 248 n.25 (Okla. 1996) (quoting Restatement (Second) of Torts § 46 cmt. d). Generally, the case is one where "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* at 249 n.25. In addition, whether the tortfeasor's conduct was extreme and outrageous must be considered in the setting in which the conduct occurred. *Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986) (holding that nature of the conduct should not be considered in a sterile setting, detached from the milieu in which it took place); *see also Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1559 (10th Cir. 1995) (applying Oklahoma law and noting that court must focus on the totality of the circumstances).

The third element of an emotional distress claim requires proof that the tortfeasor's conduct caused the plaintiff's emotional distress. *Computer Publ'n,* 49 P.3d at 735.

Finally, the fourth element requires proof that the plaintiff's emotional distress was "so severe that no reasonable [person] could be expected to endure it." *Computer Publ'n,* 49 P.3d at 736 (quoting *Breeden*, 575 P.2d at 1377 n.6). While emotional distress includes "all highly unpleasant mental reactions," it is only where the emotional distress is extreme that liability arises. *Miller v. Miller*, 956 P.2d 887, 901 n.44 (Okla. 1998). "The intensity and the duration of the

distress are factors to be considered in determining its severity." *Breeden*, 575

P.2d at 1378 n.6 (quoting Restatement (Second) of Torts § 46 cmt. j). Moreover,

although severe distress must be proved, "in many cases the extreme and

outrageous character of the defendant's conduct is in itself important evidence

that the distress has existed." *Id*.

## 2. The District Court's Order

After a bench trial, the district court found the government liable for

intentional infliction of emotional distress.[7] The court found in part:

> Trial testimony established that news of Trentadue's
> death came as a shock to his family members. . . . The
> family [had not been] advised by anyone at the FTC or
> the BOP that an autopsy had been performed; thus the
> family was first made aware of the autopsy by viewing
> the obvious signs of the intrusive procedure on his body
> after it was received on August 26, 1995. Despite the
> numerous, unusual, and obvious extensive injuries to

---

[7] Under Oklahoma law the trial court must assume a gatekeeper role with respect
to intentional infliction of emotional distress claims by making a threshold legal
determination that the defendant's conduct may reasonably be regarded as
sufficiently extreme and outrageous to meet the Restatement § 46 standards.
*Breeden*, 575 P.2d at 1377-78. If the court concludes that reasonable persons
could differ in the assessment of the disputed facts, the court submits the claim to
the jury to determine whether the defendant's conduct should result in liability.
*Id.* Similarly, the court makes an initial determination whether severe emotional
distress can be found and the jury determines whether such distress in fact
existed. *Id.*

Since the FTCA portion of this case was tried to the court, the court made
both the initial legal determinations of outrageousness and severe distress, as well
as the ultimate findings of injury and liability.

Trentadue's body, the family had not been told in advance of these injuries and were thus also forced to discover these on their own, much to their horror.

Order, No. CIV-97-849-L, at 16-17 (W.D. Okla. May 1, 2001).

The court went on to conclude:

> [F]rom the testimony of family members, the court determines that they suffered a quantifiable level of distress over and above the expected level of emotional distress they would have suffered due to Trentadue's death and that the United States should be held liable for this distress.
>
> Evidence at trial established that the plaintiffs suffered severe emotional distress as a result of the reckless way in which they were treated by the United States in the aftermath of Trentadue's death. The court finds that plaintiffs' understandable emotional reaction to Trentadue's death was needlessly and recklessly intensified by the United States' failure to inform the family in advance as to the existence of the extensive injuries on Trentadue's body and that an autopsy had been performed. Throughout the trial, the court heard no explanation for defendant's silence in this regard. In the face of the evidence regarding the emotional distress of the plaintiffs, the court finds that plaintiffs have met their burden on their claim for intentional infliction of emotional distress and are entitled to judgment on this claim.

Id. at 17-18, 23.

We agree with the district court that the government acted in deliberate disregard of a high probability that its actions would cause the Trentadues emotional distress. The Trentadues were a grieving family searching for answers

-27-

in the wake of Kenneth Trentadue's untimely death. BOP's overall treatment of the Trentadue family, including its initial nondisclosure of the unusual circumstances of death, its obstinance concerning authorization for an autopsy, and its failure to inform the Trentadues of the body's battered condition amounted to outrageous conduct that "needlessly and recklessly" intensified the family's emotional distress.[8] Thus the district court properly determined that plaintiffs proved the first, second, and third elements of the tort of emotional distress, intentional or reckless conduct, outrageousness, and causation.

However, because the district court did not make explicit findings as to the severity of each individual plaintiff's emotional distress, we are unable to determine from the district court's order whether the fourth element of the tort has been met. Accordingly, we vacate the FTCA judgment in favor of the plaintiffs and remand for additional findings on whether the emotional distress suffered by each plaintiff was severe under Oklahoma law.

### D. Judgment Bar

---

[8] The government argues at length that the Trentadues were on notice that an autopsy would be performed and that Jesse Trentadue in fact consented to one. However, the record shows Warden Carter told Jesse that he could not authorize Trentadue's autopsy without his mother's power of attorney. The record is unclear on whether the FTC ever received Wilma Trentadue's power of attorney. However, whether such authorization was later received does not excuse BOP's treatment of the family, especially in light of Warden Carter's repeated insistence that proper consent was necessary and her failure to inform the family that an autopsy had in fact been performed.

Relying on the judgment bar provision of the FTCA, 28 U.S.C. § 2676,[9] Lieutenant Stuart Lee argues that the district court's entry of judgment on plaintiffs' FTCA claims required the court to vacate the judgment entered against him in the *Bivens* action. We agree.

We note first that the district court tried plaintiffs' FTCA and *Bivens* claims contemporaneously in a bifurcated proceeding. *See United States v. Yellow Cab Co.*, 340 U.S. 543, 555-56 (1951) (suggesting bifurcation when FTCA claims are joined with claims carrying the right to a jury). On December 15, 2000, the jury found Lee liable for constitutional violations under *Bivens* and the district court entered judgment on the verdict on January 12, 2001. The court entered judgment on the FTCA claims several months later. Lee argues that the district court was required at this point to vacate the *Bivens* judgment under § 2676. We review de novo a district court's legal conclusions under the FTCA. *Farmer v. Perrill*, 275 F.3d 958, 962 (10th Cir. 2001).

We have previously explained the effect that a final judgment in a FTCA case has on a *Bivens* action based on the same underlying conduct. We said in *Engle v. Mecke*:

---

[9] The judgment bar provides that a "judgment in an action under [the FTCA] shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim." 28 U.S.C. § 2676.

-29-

> When a federal law enforcement officer commits an intentional tort, the victim has two avenues of redress: 1) he may bring a *Bivens* claim against the individual officer based on the constitutional violation, or 2) he may bring a common law tort action against the United States pursuant to the FTCA. These are separate and distinct causes of action arising out of the same transaction. A decision to sue the government, however, affects the availability of a *Bivens* action against the federal officer. Although the plaintiff may elect initially to bring his action against either defendant, a judgment against the United States under the FTCA constitutes "a complete bar to any action by the claimant, by reason of the same subject matter, against the employee . . . whose act or omission gave rise to the claim." 28 U.S.C. § 2676.

24 F.3d 133, 135 (10th Cir. 1994) (citations omitted) (ellipses in original).

As we made clear in *Farmer*, the judgment bar in § 2676 precludes plaintiffs from bringing a *Bivens* claim regarding the same subject matter regardless of whether the final FTCA judgment is rendered in favor of a plaintiff or the government. *See* 275 F.3d at 963. The phrase "by reason of the same subject matter" in § 2676 has been interpreted to mean "arising out of the same actions, transactions, or occurrences." *Serra v. Pichardo*, 786 F.2d 237, 239-40 (6th Cir. 1986); *see also Armstrong v. Vogel*, 424 F. Supp. 445, 447 (D.S.C. 1977) (substance of claim must be considered in deciding whether the claim arises by reason of same subject matter as previous action brought under FTCA).

Here, plaintiffs' FTCA action involved the same subject matter as their *Bivens* claim: the alleged misconduct of prison officials, including Lee, in

-30-

responding to Trentadue's death. Although plaintiffs ultimately recovered on narrower grounds than those alleged in their complaint, this does not affect our determination that the two claims arose out of the same "actions, transactions, or occurrences" for the purposes of § 2676.

Further, the fact that the district court entered judgment on the *Bivens* claims before issuing its order and judgment in the FTCA case is inconsequential under § 2676. The FTCA's judgment bar constitutes "a complete bar to *any* action" based on the same subject matter as the claimant's FTCA case. 28 U.S.C. § 2676 (emphasis added). Although the language of the statute does not speak to situations where FTCA and non-FTCA claims are tried together in the same action, *see Kreines v. United States*, 959 F.2d 834, 838 (9th Cir. 1992), we interpret § 2676 to apply to the *Bivens* judgment here. A contrary rule would permit plaintiffs to escape the judgment bar's preclusive effect in cases like this, where the district court waited to enter judgment on FTCA claims tried contemporaneously with *Bivens* claims. Such is not the intent of the rule. *See Farmer*, 275 F.3d at 963 n.7 (Congress intended to prevent multiple lawsuits as well as multiple recoveries) (citing *Hoosier Bancorp of Ind. v. Rasmussen*, 90 F.3d 180, 184 (7th Cir. 1996), and *Gasho v. United States*, 39 F.3d 1420, 1437 (9th Cir. 1994)).

We thus conclude that a final judgment in the FTCA action will bar the *Bivens* action against Lee.  Accordingly, upon entry of a final judgment in the FTCA action, the district court shall dismiss the *Bivens* action against Lee.[10]

## III. Cross-Appeals

In a voluminous cross-appeal, plaintiffs assert twenty-one legal and factual errors by the district court that they contend individually or cumulatively require reversal of the issues below on which they failed to prevail.  We conclude that none of the asserted errors requires reversal.

## A. Standards of Review

A district court's factual findings are reviewed under the clearly erroneous standard of Fed. R. Civ. P. 52(a).[11]  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)); *United*

---

[10]Given our conclusion, we need not address plaintiffs' contention on cross-appeal that the district court erred in granting summary judgment in favor of Lieutenant Kenneth Freeman.  The FTCA's judgment bar applies to the suit against him for the same reasons we determined it barred the        *Bivens*  judgment against Lee. Therefore, we affirm the district court's dismissal of the        *Bivens*  action against Freeman.

[11] The rule provides in part:  "Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

*States v. De La Cruz-Tapia*, 162 F.3d 1275, 1277 (10th Cir. 1998) (same). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson*, 470 U.S. at 573. "In applying the clearly erroneous standard . . . appellate courts must constantly have in mind that their function is not to decide factual issues de novo." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969).

A district court's decision to review certain documents in camera or ex parte is reviewed for abuse of discretion, *United States v. Perez-Gomez*, 638 F.2d 215, 218 (10th Cir. 1981), as are decisions to require permission to file certain pleadings and to deny motions for sanctions. *See Gust v. Jones*, 162 F.3d 587, 598 (10th Cir. 1998). We similarly review evidentiary rulings for abuse of discretion. *United States v. Fuentez*, 231 F.3d 700, 708 (10th Cir. 2000). Finally, we review the district court's legal conclusions de novo. *Battenfield v. Gibson*, 236 F.3d 1215, 1220 (10th Cir. 2001).

The harmless-error rule is used to determine "whether an individual error requires reversal." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). Cumulative-error analysis, on the other hand, "aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that

collectively they can no longer be determined to be harmless." *Id.* at 1470. "The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error--courts look to see whether the defendant's substantial rights were affected." *Id.* "However, just as harmless-error analysis is utilized only to determine whether actual *error* should be disregarded, a cumulative-error analysis aggregates only actual errors to determine their cumulative effect." *Id.* (emphasis in original).

## B. Evidentiary Findings

Plaintiffs first contend on cross-appeal that the district court's finding that Trentadue's injuries were self-inflicted was clearly erroneous. According to plaintiffs, the finding is in direct conflict with uncontroverted testimony about the injuries to Trentadue's head and the bruises on Trentadue's arms, lower body, and soles of his feet. The plaintiffs also argue the finding is in conflict with uncontroverted evidence that someone else's blood was found in the cell. To the plaintiffs, this evidence contradicts BOP's assertion that Trentadue was the sole occupant of the cell. While the facts of this case are indeed troubling, we disagree that the district court committed clear error on this record.

At trial, Commander Tom Bevel of the Oklahoma City Police Department testified that the forensic evidence led to the conclusions (1) that Trentadue tried to hang himself twice, and (2) that Trentadue sustained the injuries to his head

and body when the sheet he used as a ligature gave way during the first attempt.[12]

Bevel also testified that the physical evidence showed Trentadue used a toothpaste tube to cut multiple lacerations into his throat before trying to hang himself the second time. A handwriting expert testified that the note written on Trentadue's cell wall—"My Mind No Longer It's Friend Love ya. Familia!"—matched previous samples of Trentadue's handwriting. The district court concluded that this writing could reasonably be regarded as a suicide note. In addition, the court found that the government introduced credible evidence discounting the importance of finding someone else's blood in the cell: the blood was a small spot on the mattress from the top bunk and the cell had previously been used to house other inmates.

In addition to this testimonial evidence, the record shows multiple investigations by federal and local law enforcement agencies that arrived at the same conclusion about Trentadue's death. After the DOJ's Civil Rights Division began supervising the FBI's investigation of Trentadue's death, a federal grand jury was convened, and the Civil Rights Division presented evidence to the grand jury over the course of a year. The grand jury declined to pursue murder charges

---

[12] Commander Bevel testified, "Upon [the ligature] breaking, [Trentadue] falls forward striking his head. His own inertia upon striking his head basically [sic] he ricochets off the edge of the desk. His head then impacts the wall . . . . Then we have his head coming upward hitting . . . the underside of the stool."

against any of the prison officials or inmates.  Thereafter, the DOJ's Office of the Inspector General conducted an extensive investigation into the matter and issued a report in November 1999 that substantiated the grand jury findings.[13]  In 1998, the Oklahoma City Police Department, at the direction of the Oklahoma City District Attorney, conducted its own criminal investigation into Trentadue's death.  The investigation team "found no evidence that [Trentadue] was beaten" and concluded that "Mr. Trentadue's death was a suicide."  Based on this report, the Oklahoma Medical Examiner, Dr. Fred Jordon, a person who had previously expressed doubt about whether Trentadue committed suicide, amended his findings on the cause of death from "unknown" to "suicide."

We acknowledge that many of the circumstances surrounding Trentadue's death have given us pause, not the least of which was the response by FTC officials on the morning Trentadue was found hanging.  Few institutional deaths raise so many questions.  The district court, however, after listening to witness testimony over the course of a four-week trial, thoroughly documented the evidentiary problems that have prevented investigators from determining exactly what happened the morning of August 21, 1995.  In light of the record on appeal we cannot say that our review of the evidence leaves us with the definite and firm

---

[13] The district court placed the contents of the Office of the Inspector General's report under seal.

conviction that the district court committed a mistake.[14]   Therefore, we conclude

the district court's findings that Trentadue's injuries were self-inflicted and that

his death was a suicide were not clearly erroneous.

## C. Destruction of Evidence

Plaintiffs next argue that the district court committed clear error in finding

that federal officials had not engaged in the intentional destruction of evidence.

In related contentions, plaintiffs argue that the district court erred in rejecting

their spoliation claim and abused its discretion in refusing to sanction the

government for the destruction or loss of evidence.  We reject each contention in

turn.

### 1. Destruction of Evidence

With regard to the destruction of evidence claim, the district court found

that "the loss of potential evidence was the result of ignorance or incompetence

[by federal officials] as opposed to intentional behavior."  Although we agree

with the district court that the government's handling of evidence in this case

deviated from standard investigative practices, on the evidence before us we

---

[14] Notably, the jury that heard the assault, battery, and conspiracy claims against Lee also declined to find that Lee or someone else had inflicted Trentadue's injuries.

-37-

cannot conclude that the court erred in finding that prison officials did not intentionally destroy relevant evidence.[15]

As part of his investigation, Lieutenant Freeman took photographs of the scene in an attempt "to photograph everything in the cell that had blood on it."[16] He photographed the handwritten note on Trentadue's cell wall, as well as Trentadue's body in the infirmary. Trial witnesses testified that Freeman's photographs accurately portrayed the cell and the body as they appeared on the morning of Trentadue's death. In addition to the photographs, Freeman collected several items of physical evidence that he turned over to the medical examiner's office. Given that prison guards told Freeman that Trentadue's death was a suicide, he had less reason to consider the cell a crime scene, and his actions therefore support the district court's conclusion that he did not intentionally destroy evidence. Further, plaintiffs' counsel thoroughly tested Freeman's credibility on this issue during cross-examination at trial.

---

[15] Plaintiffs contend BOP officials intentionally destroyed Trentadue's clothing, the SHU's cell rotation log, and other records of an inmate's location in the SHU. Plaintiffs also argue cleaning Trentadue's cell the day after his death and painting over the hand written note in his cell constitute intentional destruction of evidence.

[16] In addition to the photographs and items of physical evidence collected from the cell, subsequent luminol testing revealed that blood was located in the cell where the photographs showed it to be.

The government provides less satisfactory explanations for the missing cell rotation log and Trentadue's missing clothing. Nonetheless, giving due regard to the opportunity of the trial court to judge the credibility of witnesses, Fed. R. Civ. P. 52(a), we conclude the district court did not commit clear error in finding no intentional destruction of evidence.

## 2. Spoliation

Citing *Patel v. OMH Medical Center, Inc.*, 987 P.2d 1185 (Okla. 1999), the district court rejected plaintiffs' spoliation claim. In *Patel*, the Oklahoma Supreme Court stated "[n]either spoliation of evidence nor prima facie tort (for acts constituting spoliation of evidence) has ever been recognized by this court as actionable." *Id.* at 1202. We have found no authority that suggests otherwise. *See id.* ("Although a few jurisdictions have adopted the tort of spoliation, most of the courts which have considered the issue have refused to recognize spoliation as an independent cause of action in tort.") (footnotes omitted).

Because the "test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred," *Rayonier, Inc. v. United States*, 352 U.S. 315, 319 (1957), and spoliation is not a recognized

tort in Oklahoma, we conclude that the district court did not err in denying plaintiffs' claim.[17]

## 3. Sanctions

Nor do we agree that the district court abused its discretion in refusing to sanction the government for the destruction or loss of evidence. The district court has discretion to fashion an appropriate remedy depending on the culpability of the responsible party and whether the evidence was relevant to proof of an issue at trial. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) (requiring bad faith before imposing adverse inference). "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Id.*

Above we upheld the district court's finding that the loss of potential evidence was the result of ignorance or incompetence as opposed to intentional acts. Contrary to the Trentadues' arguments on appeal, the district court did consider the loss or destruction of evidence by drawing "reasonable inferences from the circumstances surrounding lost or inaccurate evidence in deciding what weight should be given to that evidence." Order, No. CIV-97-849-L, at 24 (W.D. Okla. May 1, 2001). Moreover, "[d]uring trial, plaintiffs were allowed to explore

---

[17] We also reject for the same reason plaintiffs' argument that the Restatement (Second) Torts § 870 establishes the tort of spoliation in Oklahoma.

the possible reasons for the mishandling of evidence and were allowed to make arguments regarding the significance of the evidence" to the judge. *Id.* Under these circumstances, we conclude the district court did not abuse its discretion in refusing to sanction the government.

## D. Injunctive or Declaratory Relief

Plaintiffs also contend that the district court abused its discretion in refusing to grant declaratory or injunctive relief against the government. According to plaintiffs, the loss or destruction of documents by the government and the perjury by government employees violated plaintiffs' civil rights under the Fifth Amendment. Even if this were true, however, the district court lacks subject matter jurisdiction under the FTCA to provide injunctive and declaratory relief. *See* 28 U.S.C. § 1346(b) (providing the district courts have jurisdiction over all civil actions on claims against the United States, "for money damages, . . . for injury or loss of property, or personal injury or death"). At trial, no individual defendants remained except for Lee, and no basis existed for any injunctive relief directed to him. Except for the order dismissing Freeman, the Trentadues did not appeal the orders dismissing the individual defendants, and they voluntarily dismissed several of the FTC defendants before trial. Therefore, we perceive no abuse of discretion in the trial court's decision not to grant any form of injunctive relief.

-41-

E. Burden-Shifting Presumptions

Plaintiffs argue that the district court erred in requiring the plaintiffs to prove that Trentadue was alive when discovered by prison guards, and in failing to apply appropriate burden-shifting presumptions regarding suicide, time of death, and spoliation. We disagree.

Without citing any Oklahoma authority, plaintiffs maintain that the district court improperly placed the burden on them to prove Trentadue was revivable when discovered, rather than requiring the government to prove that Trentadue was dead. Under Oklahoma law, however, "[i]n an action for the recovery of damages for wrongful death of decedent, the burden of proof is upon the plaintiff to establish by competent evidence that a negligent or wrongful act of defendant was the proximate cause of death." *Jines v. City of Norman*, 351 P.2d 1048, 1052 (Okla. 1960). We therefore conclude that the district court properly left the burden of proving Trentadue was still alive with the plaintiffs.

Plaintiffs next argue that the law's presumption against suicide places the burden of proving suicide on the party claiming that fact and, further, that a presumption of continuance of life arises whenever the time of a person's death is uncertain. In Oklahoma, "a presumption is merely a procedural tool for ordering proof, and does not constitute affirmative evidence." *Weber v. Continental Cas. Co.*, 379 F.2d 729, 732 (10th Cir. 1967) (quotations omitted). "When evidence is

introduced rebutting the presumption, the presumption disappears, leaving in evidence the basic facts which are to be weighed." *Id.* (quoting *Stumpf v. Montgomery*, 226 P. 65, 68 (Okla. 1924)). Thus, "the presumption against suicide is overcome by evidence showing the death was self-inflicted, . . . or circumstances and conditions leaving no room for any reasonable hypothesis but suicide." *Runyon v. Reid*, 510 P.2d 943, 952 (Okla. 1973) (quoting *Frankel v. New York Life Ins. Co.*, 51 F.2d 933, 935 (10th Cir. 1931)).

Here, the presumption against suicide disappears in the face of evidence that Trentadue's injuries were self-inflicted. *See Weber*, 379 F.2d at 732. Further, with regard to the uncertainty about the precise time of Trentadue's death, the district court found "there was no evidence from lay witnesses or experts that Trentadue could have been revived," and therefore, "plaintiffs [could not] demonstrate that the actions of the FTC personnel were the cause of Trentadue's death." Order, No. CIV-97-849-L, at 21 (W.D. Okla. May 1, 2001).

Lastly, an adverse presumption that follows the destruction or spoliation of evidence "arises only in cases of 'willful destruction [or] suppression.'" *Beverly v. Wal-Mart Stores, Inc.*, 3 P.3d 163, 165 (Okla. Civ. App. 1999) (citing *Harril v. Penn*, 273 P. 235, 237 (Okla. 1927)). Thus, "[m]ere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407

-43-

(10th Cir. 1997).  Above we concluded that the district court's finding that the government did not intentionally destroy evidence was not clearly erroneous.  Consequently, the district court did not err.

## F. Physical Fact Rule

Plaintiffs contend that the district court erred in not applying the "physical fact" rule.  The physical fact rule is an evidentiary device that disregards oral testimony at odds with physical evidence introduced at trial.  *See, e.g., Whittington v. Mayberry*, 190 F.2d 703, 705 (10th Cir. 1951).  Specifically, plaintiffs assert that evidence at trial established (1) that "the noose portion of the ligature was not cut"; (2) that "the remaining ligature in Trentadue's cell hung to within four feet of the cell floor"; (3) that "the presence of liver [sic] mortis in the tip of Trentadue's nose resulted from him lying face down on the floor of his cell after death rather than hanging"; and (4) that "someone else's blood [was present] in Trentadue's cell."  This evidence, they argue, "required the District Court to reject all testimony, including Lee's, about Trentadue having been found hanging and cut down[,]" and "all testimony, including Lee's, about Trentadue having been alone in his cell."

Although no trier of fact "can be allowed to return a verdict based upon oral testimony which is flatly opposed to physical facts, the existence of which is incontrovertibly established, . . . courts should not indulge in arbitrary deductions

from physical law and fact except where they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other deductions." *Grubbs v. Hannigan*, 982 F.2d 1483, 1488 (10th Cir. 1993) (quoting *Born v. Osendorf*, 329 F.2d 669, 672 (8th Cir. 1964)). In this case, none of the evidence offered by plaintiffs is "so clear and irrefutable" as to leave no room for other reasonable explanations, such as those made by the district court and jury here. Accordingly, we detect no error.

## G. Presumption of Life

We also reject plaintiffs' contention that the district court erred in refusing to apply the Oklahoma definition of "death." Plaintiffs cite the Oklahoma Uniform Determination of Death Act for the proposition that Lee and other FTC personnel were required to make "all reasonable attempts to restore spontaneous circulation or respiratory functions." Okla. Stat. tit. 63, § 3122 (2002). However, the section on which plaintiffs rely is "part of the public health laws and defines the conditions establishing that a person is dead," *In re Estates of Perry*, 40 P.3d 492, 496 (Okla. Civ. App. 2001), and does not in our view create an evidentiary presumption contrary to the district court's findings. The district court did not commit error in refusing the proffered instruction.

## H. In Camera Review

Plaintiffs contend that the government's "ex parte submissions" to the court violated their rights to due process and access to the courts. However, the four submissions identified by plaintiffs as "ex parte" are more properly characterized as "in camera" submissions. Each matter was submitted for the trial court's consideration under a claim of privilege or legal obligation of secrecy, and the plaintiffs had adequate notice of such submissions and an opportunity to argue for the matter's disclosure.

To the extent the submission of any matter can rightly be construed as an ex parte proceeding, we note that "[n]ot all ex parte proceedings violate due process or even raise a serious constitutional issue." *Simer v. Rios*, 661 F.2d 655, 679 (7th Cir. 1981). We have carefully examined the record regarding these submissions and find no merit in the Trentadues' allegation of error. Moreover, the Trentadues can point to no prejudice or harm arising from the motions for in camera review, nor did they contemporaneously allege bias by the district court. Accordingly, we conclude that the district court did not abuse its discretion. *See United States v. Perez-Gomez*, 638 F.2d 215, 218 (10th Cir. 1981).

## I. Protective Order

Nor do we agree that the protective order entered by the district court violated plaintiffs' constitutional rights. District courts have discretion to issue protective orders consistent with the limitations set forth in Fed. R. Civ. P. 26(c).

After reviewing its order we cannot say that the district court "abdicate[d] its responsibility to oversee the discovery process and to determine whether filings should be made available to the public." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). The government showed good cause for the need to protect confidential materials produced during discovery, and the court's order "provide[d] a mechanism for the parties to challenge the designation of confidentiality as to particular items of information." Order, No. CIV-97-849-L, at 6 (W.D. Okla. Aug. 18, 2001).

J. Permission to File

Plaintiffs also contend that the district court's order preventing them from filing motions, briefs, and other matters of record without prior court approval constituted an unconstitutional "filing ban." The order, however, was not a ban. It merely required the Trentadues to apply to the court for permission to file motions. Order, No. CIV-97-849-L, at 1 (W.D. Okla. June 28, 2000). Further, the district court imposed the order because it found that "the parties filed what must be a record-setting number of new motions which, from the court's brief review, suggest anything but an attempt to prepare this matter for trial in an efficient and reasonable manner." *Id.* In their conclusory allegations, plaintiffs do not identify any documents whose exclusion as a result of the district court's order prejudiced their case. Thus, no constitutionally significant deprivation

-47-

occurred and the court's action was soundly within its discretion. *See Gust v. Jones*, 162 F.3d 587, 598 (10th Cir. 1998).

## K. Additional Findings of Fact

Plaintiffs next contend that the district court erred in denying their request to make findings that the government's efforts to conceal the true manner of Trentadue's death by destroying or fabricating evidence, perjury, and other similar acts constituted intentional infliction of emotional distress.

We previously concluded that the district court's finding that the government did not intentionally destroy evidence was not clearly erroneous. Further, the district court stated that its "rulings on plaintiffs' claims for emotional distress are not based on actions taken by the United States in connection with the investigation of Trentadue's death." Order, No. CIV-97-849-L, at 24 (W.D. Okla. May 1, 2001). Accordingly, no basis existed for the court to find that such acts constituted intentional infliction of emotional distress.

Nor is there any basis for reversing the district court's determination not to find perjury on the part of the guard who allegedly videotaped the entry into Trentadue's cell. Deference to the trial court's findings is at its greatest when those findings are based on determinations regarding witness credibility. *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). Nothing in the record suggests the district court's determination in this respect was clear error.

L. Hearsay Objections and Discovery Conduct

Plaintiffs argue that the district court erred in excluding seven trial exhibits on the basis of hearsay. "Given the fact specific nature of hearsay objections, we accord greater deference to the district court's hearsay rulings." *United States v. Fuentez*, 231 F.3d 700, 708 (10th Cir. 2000) (citing *United States v. Trujillo*, 136 F.3d 1388, 1395 (10th Cir. 1998)). Even assuming the district court abused its discretion in excluding a particular exhibit, any error in this regard must be considered harmless, given our conclusions above. *See United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (a district court's evidentiary decisions must affect a defendant's substantial rights to warrant reversal).

For the same reasons, we reject plaintiffs' argument that the district court erred in not allowing Jesse Trentadue to pursue his separate emotional distress claim against the government along with plaintiffs' other FTCA claims. Plaintiffs made a series of conclusory allegations that the DOJ was attempting to "indict" Jesse Trentadue for tampering with witnesses. The district court properly concluded that these allegations were collateral to the issues before the court involving Kenneth Trentadue's death and declined to make additional findings. Moreover, the plaintiffs' allegations are primarily centered around the conduct of the government's trial counsel during discovery, and are not evidence of

misconduct by federal officials investigating Trentadue's death. We see no abuse of discretion by the court in limiting evidence on this issue.

## M. Cumulative Error

Finally, because the Trentadues have failed to demonstrate on cross-appeal that the district court committed any material factual or legal errors during the course of a nearly four-week trial, their assertion that the cumulative impact of errors deprived them of a fair trial is without merit. *See Rivera*, 900 F.2d at 1471.

## IV. Conclusion

The FTCA action, 02-6030, is vacated and remanded to the district court for supplemental findings on whether, under Oklahoma law, each plaintiff suffered severe emotional distress. We reverse the judgment entered against Stuart Lee in 01-6444 as barred under § 2676 of the FTCA. Finally, we affirm the district court's dismissal of plaintiffs' cross-appeals in case numbers 02-6037 and 02-6051, and affirm the court's dismissal of the *Bivens* action against Kenneth Freeman.

The judgment is affirmed in part, reversed in part, and the case remanded.