2002 OK 50

**COMPUTER PUBLICATIONS, INC., an Oklahoma Corporation, Plaintiff/Appellant,**

v.

**Alysia Beth WELTON, Defendant and Third–Party Plaintiff/Appellee,**

v.

**Cameron Craig, Third–Party Defendant/Appellant.**

**No. 94,983.**

Supreme Court of Oklahoma.

June 11, 2002.

---

B. Gore Gaines, Oklahoma City, OK, for Appellants.

Joseph P. Farris, Paula J. Quillin, Tulsa, OK, for Appellee.

BOUDREAU, Justice:

¶ 1 Cameron Craig (Craig) owns and operates a small business, Computer Publications, Inc. (CPI). CPI is in the business of developing and maintaining computer software. In May of 1990, CPI hired Alysia Beth Welton (Welton). She was 22 years old, single and had recently graduated from college. Craig was in his early 40's, married and had children.

¶ 2 Within Welton's first year at CPI, around May of 1991, Craig and Welton began a consensual sexual relationship. They continued this relationship for six years with sporadic "ups and downs" until Welton finally ended the relationship in May of 1997. Craig did not want to end the relationship and tried to get Welton to resume it. She would not. Finally, after resisting his overtures for another five months, Welton quit her job at CPI without having another job. A week or two later, one of CPI's customers called Welton at her home, after learning from CPI that she was no longer at CPI, to have her perform some work on an hourly basis on the same source code that Welton had serviced while at CPI.

¶ 3 Three months later, CPI sued Welton for performing this software-related work, alleging that she misappropriated CPI's trade secrets/source code. CPI also asserted claims for tortious interference with contractual and business relations and violation of the Deceptive Trade Practices Act, and sought both money damages and injunctive relief. Welton responded with a third-party claim against Craig, individually, for intentional infliction of emotional distress, and a counterclaim against CPI for bad faith allegation of trade secret misappropriation. She also asserted claims for abuse of process and tortious interference with contractual and business relations and sought both money damages and injunctive relief.

¶ 4 In pre-trial rulings the trial court disposed of all of the parties' claims except two: (1) Welton's third-party claim against Craig for intentional infliction of emotional distress, to be tried to a jury, and (2) Welton's counterclaim against CPI for bad faith allegation of trade secret misappropriation, to be tried to the court.[1]

¶ 5 From February 22–25, 2000, the trial court conducted the jury trial on Welton's third-party claim against Craig for intentional infliction of emotional distress and at the conclusion of the trial entered judgment on the jury verdict in favor of Welton, awarding her $50,000 compensatory damages and $1,000 punitive damages, together with $9,442.18 in pre-judgment interest. The trial court also awarded Welton $10,107.00 in sanctions against CPI and Craig for abuse of the discovery process. Finally, on May 7, 2000, following a bench trial on Welton's counterclaim against CPI for bad faith allegation of trade secret misappropriation, the trial court entered judgment in favor of Welton in the amount of $15,815.87. Both CPI and Craig appealed. The Court of Civil Appeals affirmed the judgment in all respects except one. It reversed the judgment on Welton's counterclaim for intentional infliction of emotional distress, concluding that Craig's conduct was not sufficiently extreme and outrageous to warrant submission of that

---

**1.** The trial court conducted a hearing on March 12, 1998, on CPI's motion for temporary restraining order. At the conclusion of the hearing the trial court denied the motion, concluding that the computer source code that Welton serviced shortly after leaving CPI was not a trade secret. The trial court disposed of all of the parties' other claims on April 1, 1999, by granting partial summary judgments.

claim to the jury. Welton sought certiorari which we previously granted.

### STANDARD OF REVIEW

¶ 6 We review the denial of Craig's motion for directed verdict *de novo. Cities Service Co. v. Gulf Oil Corp.,* 1999 OK 14, ¶ 11, 980 P.2d 116, 124. Regarding as true all evidence favorable to the non-moving party and all reasonable inferences drawn therefrom, and disregarding all evidence favorable to the moving party, we must affirm the denial unless there is an entire absence of proof on a material issue. *Franklin v. Toal,* 2000 OK 79, ¶ 13, 19 P.3d 834, 837; 12 O.S. 2001 § 698. Similarly, considering all the evidence tending to support the verdict together with every reasonable inference deducible therefrom, and rejecting all evidence adduced by the adverse party which does not support the verdict, we must affirm a jury verdict if there is any competent evidence reasonably tending to support it. *Franklin,* 2000 OK 79, ¶ 12, 19 P.3d at 837.

### THE TORT OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

¶ 7 Oklahoma first adopted the tort of intentional infliction of emotional distress, also known as the tort of outrage, in *Breeden v. League Services Corp.,* 1978 OK 27, 575 P.2d 1374. The tort is governed by the narrow standards of the Restatement (Second) of Torts § 46.[2] *Id.* The tort requires evidence of extreme and outrageous conduct coupled with severe emotional distress. *Gaylord Entertainment Co. v. Thompson,* 1998 OK 30, ¶ 45, 958 P.2d 128, 149. To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.

2. Section 46, RESTATEMENT (SECOND) OF TORTS (1977) reads, in pertinent part:
    46. Outrageous Conduct Causing Emotional Distress
    (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe

¶ 8 The trial court acts as a gatekeeper regarding the outrageousness of the defendant's conduct and the severity of the plaintiff's distress. *Miller v. Miller,* 1998 OK 24, ¶ 34, 956 P.2d 887, 901. The roles of the trial court and the jury are well established:

> The court, in the first instance, must determine whether the defendant's conduct may reasonably be regarded as *so extreme and outrageous* as to permit recovery or whether it is necessarily so. Where, under the facts before the court, reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether the conduct in any given case has been significantly extreme and outrageous to result in liability. Likewise, it is for the court to determine, in the first instance, whether based upon the evidence presented, *severe emotional distress* can be found. It is for the jury to determine whether, on the evidence, severe emotional distress in fact existed.

*Breeden,* 1978 OK 27, 575 P.2d at 1377–78 (emphasis in original, footnotes omitted). The trial court's gatekeeper role with regard to the second and fourth elements of the tort of intentional infliction of emotional distress ensures that only valid claims reach the jury under the appropriate legal standards.

¶ 9 The second element of this tort requires proof that the defendant's conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and that such conduct is regarded as atrocious and utterly intolerable in a civilized community. *Kraszewski v. Baptist Medical Center of Oklahoma, Inc.,* 1996 OK 141, 916 P.2d 241, 248. In general, a plaintiff must prove that the recitation of defendant's conduct to an average member of the community would arouse the listener's resentment against the defendant and would lead the listener to exclaim "Outrageous!" *Id.*

emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

■ ¶ 10 In this case, regarding as true all evidence and reasonable inferences favorable to Welton and disregarding all evidence favorable to Craig, the record shows that Craig harassed Welton virtually non-stop after she quit her job with CPI on October 31, 1997. Craig wanted Welton to come back to work for him and wanted her to resume their intimate relationship. He harassed her for two years, through at least November of 1999. He did not stop harassing her after CPI sued her in February of 1998, after the trial court ruled against CPI on its motion for temporary restraining order in March of 1998, after Welton became engaged to Keith Dixon in June of 1998, after Welton married Keith Dixon in September of 1998, after the trial court ruled against CPI and Craig on all of their claims in April of 1999, or after the attorney for CPI and Craig took Welton's deposition in May of 1999. In those two years Craig repeatedly attempted to contact Welton. He called her land-line phones, called her cell-phones, left voice mail on her phones, sent e-mails, mailed letters and cards and sent flowers and gifts. In two of his letters he asked her to contact his psychologist. He found out where she worked and twice dropped letters through the sun-roof of her car while she was at work. He called her friends and asked them to intervene on his behalf. He drove slowly past her house. He drove through her neighborhood. He showed up at restaurants where she went with friends. Welton not only did not respond to Craig's attempts to contact her, she took steps to avoid him. She changed her phone numbers. She moved out of her apartment before her lease ended and lived for two months with a friend. None of this worked, as Craig was able to learn her new phone numbers, learn her friend's address, learn her new e-mail addresses and learn where she worked.

¶ 12 We do not find an entire absence of proof as to whether Craig's conduct was sufficiently extreme and outrageousness to warrant submission of that issue to the jury. We conclude the trial court properly denied Craig's motion for directed verdict on this element of the tort.

■ ¶ 13 The fourth element of the tort of intentional infliction of emotional dis-

tress requires proof that the emotional distress suffered by the plaintiff was "so severe that no reasonable [person] could be expected to endure it." *Breeden*, at 1377–78, n. 6. While "emotional distress includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea," it is only where the emotional distress is extreme that liability arises. *Miller v. Miller*, 1998 OK 24, 956 P.2d 887, 900 n. 44. "The intensity and duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.... The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge." *Breeden*, 1978 OK 27, 575 P.2d at 1377–78, n. 6.

■ ¶ 14 In this case, regarding as true all evidence and inferences favorable to Welton and disregarding all evidence favorable to Craig, the record shows that Welton, who is by nature stoic, was very afraid of Craig. One of her friends testified: "[Alysia] was scared. I mean she would shake when she read [the letters]. She was—and she's not like that. I mean if you know Alysia, she's not scared of anything, and it was really weird to see her that way." The friend further testified that Alysia had never reacted that way to anything before, and that Alysia "cried [and] lost weight, had a rash all over her arms and legs and [was] just a nervous wreck." Welton described those two years of her life as having been "the worst thing I've ever gone through. Every day is a scary day. Every day I'm afraid he's going to do something, send another letter, send another card, show up in my parking lot, show up at my house. It's just the most painful thing I've ever been through." Welton testified that when she eventually called Craig's therapist, as Craig had asked, the therapist knew immediately who she was. The therapist asked if Craig was still stalking her and when Welton answered yes, the therapist suggested that Welton get a protec-

tive order against Craig. Welton became even more fearful after her conversation with Craig's therapist. She testified: "I was already stressed out about what he was doing with the letters and stuff, but [the therapist] took it to another level. Now, I was like, I didn't know what he was going to do." Welton also testified that although Craig had never threatened her physically, "I just didn't know what level he was going to take it to. Like I said, I saw him outside of Keith's house, you know. He was finding out where I lived, he was finding out phone numbers that I had disconnected. He wouldn't stop."

¶ 15 Again, we do not find an entire absence of proof of severe emotional distress on the part of Welton. We conclude the trial court properly denied Craig's motion for directed verdict on this element of the tort.

### CONCLUSION

¶ 16 The tort of intentional infliction of emotional distress requires proof of plaintiff's severe emotional distress caused by defendant's intentional or reckless extreme and outrageous conduct. The trial court must act as a gatekeeper to ensure that only valid claims reach the jury.

¶ 17 We vacate the portion of the opinion of the Court of Civil Appeals that reversed the trial court's judgment on Welton's claim for intentional infliction of emotional distress and we affirm the trial court's judgment in favor of Welton on that claim. Since no party sought certiorari with respect to any other portion of the opinion of the Court of Civil Appeals, we leave undisturbed the balance of the Court of Civil Appeals opinion.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS OPINION VACATED IN PART; TRIAL COURT JUDGMENT AFFIRMED.**

WATT, V.C.J., HODGES, OPALA, KAUGER, SUMMERS, and WINCHESTER, JJ., concur.

HARGRAVE, C.J., and LAVENDER, J., dissent.