Van WILLIAMS, Michael Stockton, Darrell Youngblood, Alonzo Edwards, Richard Moya, Ron Hayes, Donnie Caesar, Jeremiah Fields, Robert Waller, and Jack Diamond, Plaintiffs,

v.

CITY OF TULSA, OKLAHOMA, Bill Fall–Leaf, Eric Murdock, Debra Carr, Mark Rogers, and Joe Harris, Defendants.

No. 04–CV–326–HDC–SAJ.

United States District Court,
N.D. Oklahoma.

Sept. 30, 2005.

Steven R. Hickman, Frasier Frasier & Hickman, Tulsa, OK, for Plaintiffs.

Ellen Rachel Hinchee, Larry Vernon Simmons, Tulsa City Attorney, Keith A. Wilkes, William Kirk Turner, Newton O'Connor Turner & Ketchum PC, Tulsa, OK, for Defendants.

## ORDER

H. DALE COOK, Senior District Judge.

Before the Court are Defendant City of Tulsa's (the "City") Motions for Summary Judgment [Dkt. # s 23; 24; 25; and 26] and Defendants Bill Fall–Leaf, Eric Murdock, Debra Carr, Mark Rogers, and Joe Harris' (the "Supervisors") Motions for Summary Judgment [Dkt. # s 27; 28; 29; 30; and 31]. Based on the pleadings, the evidence presented, and the applicable law, the Court concludes that the motions for summary judgment are meritorious and should be GRANTED.

## UNDISPUTED MATERIAL FACTS

1. The City's Underground Collections Department ("UCD") is responsible for operating and maintaining the City's underground sewer system.

2. The City equipped the UCD with an electronic video security system. Signs

warn persons in or about the UCD that the "Premises [are] Video Taped 24–Hours a Day."

3. The video from the cameras feeds into a controller. The dispatch office, the security guard post, and an equipment room all contain monitors that display the camera's view.

4. A number of telephones in the UCD are subject to recording for quality assurance purposes. To signal their recorded status, the telephones emit a specific tone when activated.

5. In May 2002, City personnel received a complaint of surreptitious surveillance in the UCD.

6. City personnel not associated with the UCD conducted a search of the premises. They did not uncover any hidden video or audio recording devices.

7. Just seven days after the search, UCD employees discovered a cable, equipped with a microphone and audio output, that led to the air-conditioning duct above Defendant Eric Murdock's office. Murdock contacted the Tulsa Police Department.

8. A police investigation uncovered two additional hidden microphones, the first in an air conditioning vent above a supervisor's office, the second in the air-conditioning vent above the office formerly occupied by senior manager and Defendant Bill Fall–Leaf.

9. The City employed Plaintiff Van Williams as a welder at the UCD from 1998 until his retirement in 2004.

10. The City employed Plaintiff Michael Stockton at the UCD as a crew worker and a plant mechanic helper for approximately 9 years.

11. The City employed Plaintiff Ronald Hayes for approximately 25 years as a small engine mechanic. The City transferred Hayes from the UCD in 2001.

12. The City employed Plaintiff Jack Diamond for 90 days as an electronics technician in the UCD.

13. The City has employed Plaintiff Darrell Youngblood for over 10 years as an "Equipment Operator Three."

14. The City employed Plaintiff Alonzo Edwards for three years as a "Crew Leader" at the UCD. Edwards left his employment in May 2002.

15. The City has employed Plaintiff Richard Moya as a "Crew Leader Three" at the UCD for the last 19 years.

16. The City has employed Plaintiff Donnie Caesar as a "Crew Leader Two" since 1983.

17. The City has employed Plaintiff Jeremiah Fields as a "Crew Leader" at the UCD for the last 12 years.

18. The City employed Plaintiff Robert Waller for more than 36 years. Waller retired from his position at the UCD in 2005.

## PROCEDURAL HISTORY

The Plaintiffs, current and former City employees, filed this lawsuit in the District Court of Tulsa County, Oklahoma, case number CJ–2003–7970, on December 22, 2003. The Plaintiffs amended their state court petition on March 22, 2004, and Defendants removed the case to this Court on April 12, 2004. The Plaintiffs' Amended State Court Petition alleges that the City and the Supervisors conspired to and in fact implemented a system of surreptitious video and audio surveillance of the Plaintiffs and that the City and Supervisors retaliated against the Plaintiffs for bringing this case and discussing the same at the UCD. Plaintiffs bring their surveillance claims under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the Constitution, the Electronic Communications Privacy Act (18

U.S.C. § 2510 et seq.), and Oklahoma tort law. The Plaintiffs bring their retaliation claims under 42 U.S.C. § 1983 alleging a violation of the First Amendment to the Federal Constitution and under the Oklahoma State Constitution's free speech guarantee, Article II, § 22.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. When a party moves for summary judgment on the basis that there is no evidence of one or more elements of the non-movant's claim, the non-movant must direct the court to facts that establish a genuine issue of fact for trial. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). The non-movant may not rely on unsupported allegations that lack any significant probative evidence. *Id.* The court does not weigh the evidence, but inquires as to whether a reasonable trier of fact could return a verdict for the non-movant. *Shannon v. Graves*, 257 F.3d 1164, 1167 (10th Cir.2001). The existence of a mere scintilla of evidence is insufficient to preclude summary judgment. *Lanman v. Johnson County*, 393 F.3d 1151, 1154–55 (10th Cir.2004).

## CONCLUSIONS OF LAW

### Claims Against the City Under § 1983

The City argues that it cannot be held liable under 42 U.S.C. § 1983 in the absence of a showing of an official policy or custom that sanctioned the alleged conduct. Plaintiffs' response merely "submits that these employees are of high enough order in the City to justify the additional City liability." Plaintiffs Resp. to M. for S. Judgment at 20. The City is correct.

■ It is well established that municipalities do not incur liability under a theory of respondeat superior in a § 1983 suit.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 695, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To hold a municipality liable under § 1983, a plaintiff must show harm that is the result of official policy or custom, made by policy makers or "those whose edicts or acts may fairly be said to represent official policy." *Id.* "Municipal liability attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). When a plaintiff alleges that a facially lawful municipal act is the source of the harm, the plaintiff must show that the municipality acted with "deliberate indifference" as to the act's "known or obvious consequences." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

■ Nowhere do the Plaintiffs claim that an official policy or custom caused the alleged harm, and the Plaintiffs' bare assertion that the individual Defendants in this case are "of high enough order in the City" is not sufficient to raise a fact issue as to whether the individual Defendants are policy makers. Similarly, the Plaintiffs make no allegation of municipal action deliberately indifferent to a known consequence that would cause the Plaintiffs harm. Therefore, summary judgment is appropriate for the City on the plaintiffs' claims under § 1983.

### Retaliation Claims

The City and Supervisors argue that the threshold inquiry in a retaliation claim, under both the Federal and Oklahoma State Constitutions, is whether the plaintiffs spoke on a topic of public concern, but the City also notes that "it is unclear which adverse employment actions plaintiffs believe they have suffered as a result" of the speech. The Plaintiffs' response does not

direct the Court to any facts regarding what harm the Plaintiffs believe they have suffered. The amended state court petition states only that "At least in part, the surveillance concerned union activities of Plaintiffs, for which Defendants have retaliated, in violation of Plaintiffs' rights of freedom of association," and "Plaintiff Williams has been verbally counseled and retaliated against by Defendants for soliciting people to join this lawsuit."

■■■ The City and the Supervisors are correct that whether speech is on a topic of public concern is a threshold issue in a First Amendment retaliation claim.[1] *David v. City & County of Denver,* 101 F.3d 1344, 1355 (10th Cir.1996). However, the Court may decide a motion for summary judgment in a First Amendment retaliation claim without entering into the analysis prescribed by the U.S. Supreme Court in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), if the Court determines that the public employee did not suffer any adverse or detrimental employment decision. *See Lybrook v. Members of Farmington Mun. Sch. Bd.,* 232 F.3d 1334, 1339 (10th Cir.2000).

The Plaintiffs' response does not direct the Court to any evidence that is probative of whether the Plaintiffs suffered an adverse employment decision, and the Court is not required to comb the record in search of such evidence. (LCvR 56.1©); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). Therefore, because the Plaintiffs have not directed the Court to any evidence of an essential element of a First Amendment retaliation claim, that they suffered an adverse employment decision, summary judgment is appropriate.

### Fourth Amendment Claims

The Plaintiffs allege violations of the Fourth Amendment. The Defendants argue that any such claims fail because the Plaintiffs cannot demonstrate an objectively reasonable expectation of privacy.

■■■ The expectation of privacy in a place of business is less than a similar expectation in a person's home. *United States v. Leary,* 846 F.2d 592, 597 n. 6 (10th Cir.1988). Whether an employee has an objectively reasonable expectation of privacy in the workplace is determined on a case-by-case basis. *United States v. Angevine,* 281 F.3d 1130, 1134 (10th Cir.2002). Therefore it is necessary "to examine all of the circumstances of the working environment and the relevant search." *United States v. Anderson,* 154 F.3d 1225, 1230 (10th Cir.1998). Courts distinguish cases of an employee's expectation of privacy in his own office from an employee's expectation of privacy in other areas of the work place. *See e.g., United States v. Taketa,* 923 F.2d 665, 670–71 (9th Cir.1991). In *Anderson,* the court concluded that the criminal defendant had an objectively reasonable expectation of privacy in an area that was not his own office. 154 F.3d at 1230. The court's analysis focused on the fact that the defendant entered his place of employment on a weekend when he assumed no one would be there, entered an empty room, and drew the shades. *Id.* Whether an employee has an objectively reasonable expectation of privacy is an easier question where an area is not en-

---

1. The Court applies the same analysis applicable to First Amendment retaliation claims to retaliation claims brought under the Oklahoma State Constitution's free speech guarantee. *Cf. Acevedo v. City of Muskogee,* 897 P.2d 256, 262–63 (Okla.1995); *Id.* at 263 (Opala, J., concurring) (disagreeing with majority's decision to decide the case under both the First Amendment and the Oklahoma Constitution); *see also Wilson v. City of Tulsa,* 91 P.3d 673, (Okla.Civ.App.2004) (following requirement of official policy for § 1983 claims against a municipality in State free speech retaliation claims).

closed, where activities can be easily observed, and where other personnel have easy access to the area. *Thompson v. Johnson County Cmty. Coll.*, 930 F.Supp. 501, 507 (D.Kan.1996), *aff'd*, 108 F.3d 1388 (10th Cir.1997), *unpublished order and judgment at* No. 96–3223, 1997 U.S.App. LEXIS 5832, *6–*7.

 In this case, the Plaintiffs allege illegal surveillance in the UCD restroom, Eric Murdock's office, Joe Harris' office, Debra Carr's office, the maintenance shop, the lift station, the weld shop, and various other open areas. The Court concludes that the only allegation of surveillance in violation of the Fourth Amendment for which the plaintiffs would be able to show a reasonably objective expectation of privacy would be surveillance in the UCD restroom. Accordingly, the Court below examines whether there is any evidence to support this allegation.

### Intentional Infliction of Emotional Distress/Tort of Outrage

The Plaintiffs' amended state court petition alleges a cause of action for the tort of outrage, which is also known as Intentional Infliction of Emotional Distress ("IIED"). The Defendants argue that none of the acts that the Plaintiffs allege could satisfy the tort's requirements.

 Under Oklahoma law, the Restatement (Second) of Torts § 46 governs the tort of IIED. *Computer Publs., Inc. v. Welton*, 49 P.3d 732, 735 (Okla.2002). To prevail on a claim of IIED, the plaintiff must prove 1) that the defendant acted intentionally or recklessly, 2) the defendant's conduct was extreme and outrageous, 3) the defendant's conduct caused the plaintiff emotional distress, and 4) the resulting emotional distress was severe. *Id.* The trial court must determine as a matter of law whether there is sufficient evidence of extreme conduct and severe emotional distress to allow the submission

of the issue to the jury. *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1378 (Okla.1978). "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not extreme and outrageous conduct sufficient to create liability under the tort. *Id.* at 1376. The conduct must be such that when confronted with the facts, an average member of the community would be incensed. *Computer Publs., Inc.*, 49 P.3d at 735. Determination of what conduct is sufficient to satisfy the tort's requirement is made on a case-by case basis.

In the absence of analogous Oklahoma cases, the Court looks to federal courts sitting in diversity and the jurisprudence of other states that have adopted the tort of IIED to determine Oklahoma courts' likely conclusion about what conduct is sufficiently extreme to give rise to a claim. Though appearing to blur the line between differing torts, the distinction that emerges from examination of case law in surveillance-based IIED claims is the relative privacy expectation of the plaintiff. *Compare Clark v. Brien*, 59 F.3d 1082, 1086 (10th Cir.1995) (holding that under Oklahoma law, insurer's surveillance of insured's home in sufficient); *Schiller v. Mitchell*, 357 Ill.App.3d 435, 293 Ill.Dec. 353, 828 N.E.2d 323, 333–34 (2005) (neighbor's video surveillance of plaintiffs' home insufficient); *Creel v. I.C.E. & Assocs.*, 771 N.E.2d 1276, 1282–83 (Ind.Ct.App.2002) (surreptitious videotaping of church service insufficient); *Key v. Compass Bank, Inc.*, 826 So.2d 159, 168–69 (Ala.Civ.App. 2001) (turning over surveillance video to investigating officer insufficient); *Wilkins v. Nat'l Broad. Co.*, 71 Cal.App.4th 1066, 84 Cal.Rptr.2d 329, 341 (1999) (use of hidden cameras by investigative journalists insufficient); *with Boyles v. Kerr*, 855 S.W.2d 593, 600–01 (Tex.1993) (suggesting that plaintiff could have prevailed on IIED claim based on videotaping of sexual en-

counter); *Johnson v. Allen,* 272 Ga.App. 861, 613 S.E.2d 657, 661–62 (2005) (hidden camera in women's restroom sufficient).

 The Plaintiffs allege tortious surveillance in the UCD restroom, Eric Murdock's office, Joe Harris' office, Debra Carr's office, the maintenance shop, the lift station, the weld shop, and various other open areas. Based on the case law, the Court concludes that the only allegation leveled by the Plaintiffs that would rise to the required extreme of conduct required for an IIED claim is that of hidden cameras in the UCD restroom. The Court therefore examines below whether there is any evidence to support the Plaintiffs' allegation.

### *Invasion of Privacy*

Paragraph 12 of the Plaintiffs' amended state court petition states that "The surveillance by Defendants has invaded the privacy of Plaintiffs and such constitutes the tort of outrage." The Plaintiffs' response to the Defendants' Motions for Summary Judgment argues that the Defendants failed to address the Plaintiffs' tort claim of invasion of privacy. The Defendants argue that Paragraph 12 is insufficient under Rule 8(a)(2) to allege the tort of invasion of privacy, and that since the paragraph alleges the tort of outrage, the Defendants did not brief the issue of invasion of privacy in their motions for summary judgment. Therefore, the Defendants contend, the Court should not consider the claim of invasion of privacy. However, considering the aim of notice-pleading, which is embodied Rule 8, and the fact that the Defendants' reply addresses the issue, the Court examines this claim.

 Under Oklahoma law, the Restatement (Second) of Torts governs the tort of invasion of privacy. *Ellis v. Shaw,* 826 P.2d 978, 986 n. 28 (Okla.1992). There are four distinct forms of the tort: 1)

unreasonable intrusion upon the seclusion of another, 2) appropriation of the other's name or likeness, 3) unreasonable publicity given to the other's private life, and 4) publicity that unreasonably places the other in a false light. *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 652A). Presumably, the distinct form of invasion of privacy the Plaintiffs allege is that of unreasonable intrusion on the seclusion of another. To prove the tort a plaintiff must show a non-consensual intrusion that would be highly offensive to a reasonable person. *Gilmore v. Enogex,* 878 P.2d 360, 366 (Okla.1994). The Restatement explains that the tort "consists solely of an intentional interference ... either as to [the plaintiff's person] or as to his private affairs or concerns ..." and that a "defendant is subject to liability ... only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." RESTATEMENT (SECOND) OF TORTS § 652B cmts. a & c. But, even in a public place there may be some matters so private that the invasion of which can create liability under the tort. *Id.* cmt. c (suggesting that whether the plaintiff is wearing undergarments may qualify).

 In this case, the plaintiffs allege an invasion of their privacy by surveillance in UCD restroom, Eric Murdock's office, Joe Harris' office, Debra Carr's office, the maintenance shop, the lift station, the weld shop, and various other open areas. Because the Plaintiffs could not show interference with private affairs in other employees' offices or in open areas generally, the Court concludes that the only allegation the Plaintiffs make that could come within the scope of the tort is that of surveillance in the UCD restroom. Accordingly, the Court examines below whether there is any evidence to support the Plaintiffs' allegation.

### Electronic Communications Privacy Act

■ The Electronic Communications Privacy Act ("Act"), 18 U.S.C. § 2510, et seq., creates civil liability for the intentional interception of wire, oral, or electronic communications. *See* §§ 2511 and 2520. The Act does not prohibit silent video surveillance, only interception of communication. *United States v. Falls*, 34 F.3d 674, 679–80 (8th Cir.1994); *see also United States v. Mesa–Rincon*, 911 F.2d 1433, 1437 (10th Cir.1990) (interpreting predecessor of the current statutory organization).

The City argues that the Act does not create civil liability for municipalities. The Tenth Circuit Court of Appeals has not addressed the issue; other courts are divided in their conclusions. *Compare Adams v. City of Battle Creek*, 250 F.3d 980, 985 (6th Cir.2001) (holding that the Act creates civil liability for municipalities); *Conner v. Tate*, 130 F.Supp.2d 1370, 1373–75 (N.D.Ga.2001) (holding that the Act creates civil liability for municipalities) *with Abbott v. Village of Winthrop Harbor*, 205 F.3d 976, 980 (7th Cir.2000) (holding that the Act does not create civil liability for municipalities); *Anderson v. City of Columbus*, 374 F.Supp.2d 1240, 1244–46 (M.D.Ga. 2005) (following *Abbott* ).

The Act's eavesdropping prohibition applies to any "person." § 2511. The Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." § 2510. The Act is therefore clear that not only natural persons, but also legal entities such as corporations can incur liability. However, prior to 1986, the section creating civil liability referred only to a cause of action against a "person;" that year, the Congress amended the civil liability section to read "any person whose . . . communication is intercepted . . . may in a civil action recover from the person *or entity* . . ." § 2520 (emphasis added). The Seventh Circuit, noting the silence of the relevant legislative history, refused to extend liability to municipalities based on the insertion of the word "entity." *Abbott*, 205 F.3d at 980. The Sixth Circuit, interpreting the same statutory text, but looking to the Senate Committee Report on the parallel prohibition of intercepting *stored* communications, concluded that the Congress did intend to create municipal liability with the 1986 amendment. *Adams v. City of Battle Creek*, 250 F.3d 980, 985 (2001) (citing S. Rep. 99–541, at 43 (1978), *as reprinted in* 1986 U.S.C.C.A.N. 3555, 3597). Five months after the *Adams* decision, and as part of the USA–PATRIOT Act, the Congress again amended § 2520 to add that an aggrieved party could recover from an intercepting "person or entity, *other than the United States.*" Pub.L. No. 107–56, § 223, 115 Stat. 293, 384 (emphasis added). What limited legislative history exists is silent on the addition of this language and deals primarily with the addition of administrative discipline procedures for federal officials that make unauthorized disclosures. *See* 147 Cong. Rec. H. 7159, 7198 (Oct. 23, 2001) (statement of Rep. Conyers); 147 Cong. Rec. S. 10990, 11007 (Oct. 25, 2001) (statement of Sen. Leahy).

■ Following the logic of the Sixth Circuit in *Adams* and the 2001 amendment, the Court concludes that the Act does extend civil liability to municipalities. The Act clearly included business entities within the definition of "person" prior to the 1986 amendment, but the 1986 amendment added the word "entity" in the civil liability section. Congress' subsequent amendment in 2001 to exclude the United States from entities that could be liable evidences a Congressional understanding

that the 1986 amendment created governmental liability.

Having concluded that the City may be held liable under the Act, the Court proceeds to examine the evidence to which the Plaintiffs' point in support of their claim.

### Evidence of Surreptitious Surveillance

The Defendants argue that the Plaintiffs have no evidence to support their claims. The Plaintiffs direct the Court to a number of deposition excerpts to show a genuine issue of material fact for trial. Despite the Court's disposition of many of the causes of action as unavailable for legal reasons other than an absence of evidence, the Court examines the evidence provided by the Plaintiffs to support each allegation and where applicable, reiterates the legal reason for the unavailability of a claim.

### Restroom Surveillance

The Plaintiffs point to Jack Diamond's deposition, in which Diamond describes modifying the position of one of the UCD's security cameras for the proposition that the City and the Supervisors were conducting Surreptitious surveillance. Diamond apparently modified the camera's position at the request of Defendant Supervisor Eric Murdock. Dep. of Jack Diamond, at 51. The plaintiffs point to the deposition as evidence that cameras viewed the Plaintiffs in a UCD restroom. However, Diamond states in his deposition that the camera only pointed in the direction of the restroom door and could partially view the inside of the restroom only if the restroom door was propped wide-open. *Id.* at 52. This is no evidence of illegal surveillance.

The Plaintiffs also point to Van Williams deposition, in which Williams described an "experiment" to determine the presence of a hidden camera in the automatic flush device on a urinal. The "experiment" involved Williams, in concert with Ronald Hayes, placing a paper towel over the automatic flush device's detector, leaving the restroom, and returning to see if the paper towel still covered the device. Dep. of Van Williams, at 27–28. When Williams and Hayes returned to find the paper towel no longer covered the automatic flush device, they concluded that a camera was present inside the device. *Id.* Williams' and Hayes' conclusions are speculation and are no evidence. Donnie Caesar describes a nearly identical experiment in his deposition. Dep. of Donnie Caesar, at 65–68. Caesar's conclusion is also speculation and is not evidence.

Plaintiffs refer to another portion of Williams' deposition, in which Williams describes a conversation with Joe Harris. According to Williams, Harris told him that another employee's magazine was missing from the locker-room. Id. at 58. Williams told Harris to check the cameras, and Harris grinned. *Id.* From Harris' grin, Williams concluded that 1) there was a hidden camera in the locker room, 2) Harris knew there was a hidden camera in the locker room, and 3) Harris did not know that Williams was aware of the hidden camera. *Id.* Williams' conclusion is speculation and is not evidence.

Williams also believes that a hidden audio recording device was present in the restroom because he had a conversation in the restroom with fellow employee Rick Wolfe, and according to Williams, Defendant Bill Fall–Leaf repeated a portion of Williams' words from that conversation to him at a later time. According to Williams, he told Wolfe that Wolfe was " 'going to screw [himself] away from the table,' " by continuing to have children. Dep. of Van Williams, at 107. Williams states that Fall–Leaf "repeated the exact same thing to me two days later." *Id.* It is unclear what Williams means by "the exact same thing," but considering the colorful nature of the metaphor, it hardly seems unusual that the metaphor might reappear

in some way at another place on a work site. Regardless, Williams' conclusion is speculation and is no evidence.

In his deposition, Ronald Harris stated that David Bell, an electric technician at the UCD, told Harris that there was a hidden audio recording device in the automatic flush device in the urinal. Dep. of Ronald Hayes, at 67–68. In the absence of an explanation of how David Bell supposedly knew of the audio recording device, this statement, at best, is a scintilla of evidence and insufficient to show a genuine issue of material fact.[2]

Therefore, because the Plaintiffs have failed to show a genuine issue of fact as to the existence of Surreptitious surveillance in the restroom, summary judgment is appropriate on this claim.

### Hidden Clock Cameras

The Plaintiffs direct the Court to Jack Diamond's deposition for the proposition that there were hidden cameras in two wall clocks in the UCD, one in the maintenance shop and the other in Joe Harris' office. Diamond describes personally removing a time-lapse video recorder from a wall clock in Harris' office. Dep. of Jack Diamond, at 67–68. Diamond also describes a conversation with Toby Moreland, an electric technician with the UCD. According to Diamond, Moreland described personally removing a hidden camera from a smoke detector. *Id.* at 71. Ronald Hayes testified that he saw a monitor in Eric Murdock's office that showed the inside of Joe Harris' office. Dep. of Ronald Hayes, at 40–41. This testimony is some evidence of hidden cameras in the UCD. But because the maintenance shop is an open area in which other employees frequently traverse, and activity is generally within view, there can be no claim of a violation of the Fourth Amendment. *See*

*supra,* at 5–6. Similarly, no Fourth Amendment claim will lie with respect to a camera in Joe Harris' office because none of the plaintiffs had an objectively reasonable expectation of privacy in Harris' office. *See supra,* at 5–6. Any recording that could have taken place, in the absence of a sufficient privacy expectation, could not be conduct sufficient to create an IIED claim or an invasion of privacy claim. *See supra,* at 7–10.

### Lift Station Surveillance

The Plaintiffs point to Michael Stockton's deposition testimony to show a fact issue on whether there were hidden cameras in the UCD's lift station. Stockton testified that he saw City employee Larry Potts set up a hidden camera in a cabinet. Dep. of Michael Stockton, at 31–32. Stockton's testimony is some evidence of a hidden camera in the lift station. However, because the lift station is an open area in which other employees frequently traverse, and activity is generally within view, there can be no claim for a violation of the Fourth Amendment. *See supra,* at 5–6. Any recording that could have taken place, in the absence of a sufficient privacy expectation, could not be conduct sufficient to create an IIED claim or an invasion of privacy claim. *See supra,* at 7–10.

### Other Microphones

The Plaintiffs direct the Court to Donnie Caesar's deposition, in which he states that David Bell and other electric technicians told him that the technicians installed cameras and microphones in the UCD. Dep. of Donnie Caesar, at 17–18. Caesar, however, does not remember the circumstances of the installations described to him or whether they were part of the security system. *Id.* Caesar's deposition testimony

---

**2.** In considering this testimony, the Court assumes, without deciding, that Bell's statements would fall outside the definition of

hearsay, as argued by the Plaintiffs. *See* Fed. R.Evid. 801(d)(2)(D).

is therefore no evidence of illegal surveillance.

The Plaintiffs also point to the deposition testimony of Van Williams to show a genuine issue of fact as to the existence of two hidden microphones, one in the shop facility, the other in the "key cage." A direct quotation from the Williams' testimony best illustrates his rationale for believing that he found hidden microphones:

A....I was asked to build a set of shelves to put against this wall right here (indicating). When I pulled everything out to put the shelves in there was a—there was a—oh, what am I trying say. Square intercom. Intercom box right here (indicating) hanging in the deal ...

Q....And you're saying you found microphones in both places?

A. Well, they're intercoms. What you do with an intercom is intercom is a microphone. All you do is jack it open and leave it open. Then it will pick up anything. That doesn't mean that the other person is going to talk back because you're just using it for a listening device.

Q. Okay. And how do you know that?

A. Well, it's easy. When I worked for Miller Farms, old Joe Blackburn told me that Mrs. Miller used to jack hers open so she could listen do [sic] them down at the barn when they was working with the horses.

Dep. of Van Williams, at 73–75. The Plaintiffs further direct the Court to Van Williams' deposition testimony that he and fellow employee Ralph Parker found a wire and traced it to the top of a black spray can. *Id.* at 65–67. The wire ran into a small piece of foam rubber in the top of the spray can. *Id.* at 66. Williams testifies that Ralph Parker identified the device as a microphone. *Id.* Williams acknowledges that Parker's statement was the only basis for his belief that the device

was a microphone. *Id.* at 70. Without any explanation of how Parker knew the device was a microphone, his speculation, which formed the basis of Williams' opinion, is no evidence.

The Plaintiffs also point to Williams' testimony that he found a box containing microphones like the microphone he testified that he found in the spray can lid:

... And later I went back to Ralph—I went down to the electric shop and I told Ralph, I said, "You still got that?" He said—he told me he was going to give it to Jack Pennington, but he gave it to Bill Fall–Leaf. Okay. Then I went in and asked him, I said, "Do you still got that?" He said, "No," but he said, "That's so and so." And he pulled a box off of the thing and set it down and opened it up. And there was about say ten in a box that he had.

*Id.* at 71. A collection of these items is no evidence of Surreptitious audio surveillance.

Williams also testified that because his-then immediate supervisor, Darren Stefanek, did not want to talk about Bill Fall–Leaf unless they were out of the building, he concluded that someone was eavesdropping on the conversation. *Id.* at 81–82. Williams further testified that he also thought that there was a hidden microphone in Ron Hayes' work area because Hayes often talked derogatorily about Bill Fall–Leaf, and Fall–Leaf never associated with Hayes. *Id.* at 164–165. Williams also believed that there were hidden microphones because a co-worker asked him to make modifications to the co-worker's city work truck, and 15 minutes later Floyd Emery told Williams not to make the modifications; Williams concluded that Emery overheard his conversation with the co-worker. *Id.* at 168–169. On another occasion, Williams had a conversation with his supervisor, Dee Short, in Short's

office. At the time, Williams felt that Bill Fall–Leaf was treating him unfairly, and he told Short that " 'If they don't leave me alone, I'm going down and see Slaughter.' " *Id.* at 186. After leaving Short's office to return to the weld shop, Fall–Leaf approached Williams and "wanted to know what ... my problem was." *Id.* Williams concluded that Fall–Leaf must have been eavesdropping. *Id.* Williams conclusions are speculation and are no evidence of hidden microphones.

Plaintiffs also point to Ronald Hayes' deposition testimony as probative of whether there were other hidden microphones. The testimony cited is Hayes' speculation that microphones would have been able to hear conversations in the warehouse and at a picnic table. Deposition of Ronald Hayes, at 45–46. Hayes' speculation is no evidence. Hayes also testifies about finding "speakers" and his belief that they were microphones, but there is no explanation of the circumstances surrounding the finding or what precisely it was that he found. Dep. of Hayes, at 41–54. Hayes also describes an incident in which he showed one of the speakers that he found to supervisor Jack Pennington. According to Hayes, Pennington expressed surprise and told Hayes that he wanted the speaker. *Id.* at 58. This testimony is no evidence of hidden microphones.

The Plaintiffs also present a legal argument that, they claim, allows for an inference of the existence of hidden microphones. The legal argument stems from Ronald Hayes' deposition testimony that he left one of the speakers that he found on his work bench and locked his work area. At some point, Hayes noticed that the speaker was no longer on his work bench. *Id.* at 56–57. Hayes testified that only Eric Murdock had a key to his work area and must have taken the speaker. *Id.* From this testimony, Plaintiffs argue

that the speaker in question is under Murdock's control, but that he has not produced it in this case, presumably in response to a discovery request. The Plaintiffs cite *Donohoe v. American Isuzu Motors,* 155 F.R.D. 515 (M.D.Pa.1994) and *Trentadue v. United States,* 386 F.3d 1322 (10th Cir.2004), though they do not provide a pinpoint citation that would direct the Court to the relevant portions of the opinions. The cited cases do not aid the Plaintiffs' argument. *Donohoe* discusses an evidentiary doctrine of "spoliation inference" where there is evidence that a party has destroyed evidence. 155 F.R.D. at 519–20. *Trentadue* discusses an adverse presumption that arises "in cases of willful destruction or suppression." 386 F.3d at 1344 (internal quotations and citations omitted). Hayes' speculation that Murdock took the speaker is insufficient to show willful destruction or suppression of evidence, and therefore, the Plaintiffs are not entitled to an inference of the existence of a hidden microphone.

### Weld Shop Surveillance

Williams testified in his deposition that he found a hidden camera in the weld shop where he worked. According to Williams, the camera was in a blue, plastic dome. *Id.* at 43. Williams testified that it looked like one of the blue lights that the City once had on its work trucks, but were later removed in favor of orange lights. *Id.* at 44–45. Williams concluded that the dome contained a hidden camera because "you could see a silver deal inside of it ... like part of the light or something," and he had seen a brochure that advertised a dome camera. *Id.* at 45–47. To test his conclusion, Williams conducted another "experiment" within view of the blue dome: "I got some uniforms so I laid them right here (indicating), and I picked something up, you know, that belonged to the City, and I laid it in the box, and then I carried it

outside ... I just carried it out of this warehouse." Id. at 50–51. Williams intended for his actions to appear to be a theft of City property. *Id.* at 51. When Bill Fall–Leaf later spoke with Williams about stealing, Williams concluded that the dome contained a hidden camera. *Id.* at 54. In another incident, Williams told Joe Harris that someone must have been in the weld shop because the pad lock had been changed. Harris asked Williams if anything was missing, and when Williams said he didn't know, Harris said he would have to look at the tapes. *Id.* at 136–37. When asked in his deposition what cameras Harris' referred to, Williams replied, "Hidden ones I imagine. It had to be hidden ones because the one up above the door didn't show inside the weld shop." *Id.* at 137. Williams acknowledged that there were security cameras on the outside of the building and one inside, though Williams testified that the indoor cameras only showed the hallway. From all of this, Williams concluded that hidden cameras were present in the weld shop. Williams' conclusions are speculation and are no evidence.

### Other Surveillance

Williams testified that Jack Diamond told him that someone asked him to plant a camera and listening device in Eric Murdock's office. *Id.* at 61–62. This testimony is, at best, a mere scintilla, and not sufficient to survive a motion for summary judgment.

Williams testified that David Bell told him that Bell installed cameras and microphones in Debra Carr's office. *Id.* at 182–83. Assuming that this evidence is sufficient to allow a trier of fact to find that there were such cameras and microphones, Williams testified that he can't remember ever going into Carr's office, and that he didn't know where her office was located. *Id.* at 183–84. Therefore, even if Williams testimony could establish the existence of

such devices, Williams could not show surveillance of him, and therefore could not make out a claim under the Electronic Communications Privacy Act. Williams could have no reasonably objective expectation of privacy in Carr's office, and therefore no Fourth Amendment claim is available. *See supra,* at 5–6. Any recording that could have taken place, in the absence of a sufficient privacy expectation, could not be conduct sufficient to create an IIED claim or an invasion of privacy claim. *See supra,* at 7–10.

Ronald Hayes testified that he used the telephone in his work area and that he believed his telephone conversations were intercepted. The basis for Hayes' belief was an incident in which after a telephone conversation, Eric Murdock, who was friends with Hayes at the time, told him to watch what he said and that " 'some people heard some stuff what you're saying over here.' " Dep. of Ronald Hayes, at 75. Hayes admitted that it was possible that someone simply overheard his end of the telephone conversation. *Id.* Hayes' conclusion is speculation and is no evidence.

### CONCLUSION

Having reviewed the pleadings, the motions, responses, the evidence provided by the plaintiffs, and the applicable law, the Court finds that:

1. The Plaintiffs have not pointed to any policy or custom on the part of the City that would allow a § 1983 claim.

2. The Plaintiffs have not pointed to any adverse employment decision that they suffered, and therefore, no retaliation claim is available under the First Amendment or the Oklahoma Constitution.

3. There is no evidence of the only alleged conduct that could violate the Fourth Amendment, namely restroom surveillance.

4. There is no evidence of the only alleged conduct that could constitute the tort of Intentional Infliction of Emotional Distress, namely restroom surveillance.

5. There is no evidence of the only alleged conduct that could constitute the tort of Invasion of Privacy, namely restroom surveillance.

6. The only allegation for which there is some evidence to support conduct that might violate the Electronic Communications Privacy Act, is of a hidden listening device in Debra Carr's office. However, the Plaintiffs have not pointed to any evidence that they were ever in her office when the device was allegedly present. Therefore, the Plaintiffs can not show an interception of their communications and can not make out a claim under the Act.

Accordingly, the Defendants' Motions for Summary Judgment [Dkt. # s 23; 24; 25; 26; 27; 28; 29; 30; 31] are **GRANTED**. All other pending motions in this case are **DISMISSED as MOOT**.

**IT IS SO ORDERED.**